45 So.3d 991 (2010)
David HOGG, John Hogg, George Hogg, III, Stephen Hogg and Sandra Defreese Hogg
v.
CHEVRON USA, INC. f/k/a Gulf Oil Company, E. Lee Young and E. Lee Young and Company, Inc., William Burt and ABC Insurance Company.
Nos. 2009-CC-2632, 2009-CC-2635.
Supreme Court of Louisiana.
July 6, 2010.
Rehearing Denied September 3, 2010.
*994 Oscar Price Barnes, III, for Applicant in No. 2009-CC-2632.
Barham, Warner & Bellamy, LLC, Richard G. Barham, Shreveport; Kean, Miler, Hawthorne, D'Armond, McCowan & Jarman, Leonard Louis Kilgore, III, Richard D. McConnell, Jr., Baton Rouge; Nalley & Dew, Dona Jeanne Dew, George J. Nalley, Jr., Metairie; Shotwell, Brown & Sperry, Clarence Allan Martin, III, Monroe, for Respondent in No. 2009-CC-2632.
Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Leonard Louis Kilgore, III, Richard D. McConnell, Jr., Baton Rouge; Shotwell, Brown & Sperry, Clarence Allan Martin, III, Monroe, for Applicant in No. 2009-CC-2635.
Oscar Price Barnes, III; Barham, Warner & Bellamy, LLC, Richard G. Barham, Shreveport; Nalley & Dew, George J. Nalley, Jr., Dona Jeanne Dew, Metairie, for Respondent in No. 2009-CC-2635.
WEIMER, Justice.[1]
We granted certiorari in this case to determine whether the plaintiffs' claims for damages to their immovable property resulting from the migration of gasoline from formerly leaking underground storage tanks located on neighboring property are prescribed. Finding that plaintiffs acquired constructive knowledge of the damage to their property more than one year prior to the institution of suit and that the doctrine of continuing tort does not apply to delay the commencement of prescription on plaintiffs' claims, we reverse the judgment of the district court denying the defendants' motion for summary judgment and find plaintiffs' claims have prescribed.

FACTS AND PROCEDURAL HISTORY
Plaintiffs, David Hogg, John Hogg, George Hogg, III, Stephen Hogg and Sandra Hogg DeFreese ("the Hoggs"), own property located at 1204 Gaines Avenue in Ruston, Louisiana. The neighboring property owners are defendants, E. Lee Young and E. Lee Young and Company, Inc.(collectively, "Young"), who also own a gasoline service station located on the property. At all times pertinent to this litigation, the service station was operated by defendant, William Burt ("Burt"), as "Burt's *995 Chevron." The Hoggs' property is located west/northwest of Burt's Chevron.
Prior to February 1997, the service station had three underground tanks for the storage of gasoline. These tanks were allegedly provided and/or approved by defendant Chevron U.S.A., formerly known as Gulf Oil Company ("Chevron"); the stored gasoline was the property of Chevron. The tanks were replaced in 1997 after a gasoline leak from the tanks was discovered.
By letters written in December 2001 and April 2002, the Louisiana Department of Environmental Quality ("LDEQ") informed plaintiffs and all surrounding property owners of environmental contamination in the vicinity of Burt's Chevron. The first letter, dated December 20, 2001, reported that "environmental contamination has been detected in the vicinity of Burt's Chevron," as a result "of a leaking underground storage tank system." The letter stated the contamination was "detected in the subsurface soil and groundwater," migrating in a "west-northwesterly direction toward an unnamed stream that flows north of Gaines Avenue." LDEQ reported that water samples collected from the unnamed stream, which is located on the Hoggs' property, indicated "the presence of chemicals commonly found in gasoline (i.e., Benzene, Toluene, Ethylbenzene, Xylene)." The letter specifically explained: "Due to the direction of groundwater flow, there is a possibility that gasoline may have migrated underground from the Burt's Chevron site to your property or that such migration may occur in the future."
In a second letter, dated April 26, 2002, LDEQ transmitted to plaintiffs the results of ambient air sampling conducted as part of an ongoing investigation into the release at Burt's Chevron; the sampling revealed the presence of chemicals associated with gasoline in the area adjacent to the unnamed stream. A map attached to the letter revealed the tests were conducted on the Hoggs' property. Based on the test results, LDEQ recommended that landowners limit the time spent in the area immediately adjacent to the stream. Both LDEQ letters informed the landowners they might be contacted in the future requesting permission to access their property to determine the extent of the contamination.
On or around September 12, 2006, the Hoggs received correspondence from a company with which LDEQ had contracted requesting permission to access the Hoggs' property for purposes of conducting remediation on the property. On September 6, 2007, the Hoggs filed this tort suit against Young, Burt and Chevron, seeking damages for diminution of the value of their property, the stigma of owning contaminated property, loss of enjoyment of use of the property, and exemplary damages.[2]
Responding to the petition, defendants filed motions for summary judgment asserting the plaintiffs' claims had prescribed pursuant to the one-year liberative prescription of LSA-C.C. arts. 3492 and 3493.[3] Basically, defendants argued that *996 plaintiffs acquired, or should have acquired, knowledge of the contamination and damage to their property with the receipt of the 2001 and 2002 letters from LDEQ, but failed to file suit until 2007.
Plaintiffs opposed the motions, arguing that the letters from LDEQ are subject to more than one interpretation, making the reasonableness of plaintiffs' interpretations of and responses to those letters a disputed issue of material fact which precludes a determination via summary judgment that plaintiffs acquired or should have acquired knowledge of the contamination and damage more than one year prior to September 6, 2007. In support of their position, plaintiffs submitted extracts from their depositions which acknowledged receipt of the letters, but denied any knowledge of subsurface or groundwater contamination on their property. Further, plaintiffs argued that the presence of contamination on their property is a continuing trespass on which prescription does not begin to run until the trespass is abated. Finally, they argued the defendants' failure to remediate the contamination before it reached and damaged plaintiffs' property is a separate and distinct claim, and that knowledge of the existence of that claim was not communicated to the plaintiffs in the LDEQ letters.
Following a contradictory hearing, the district court denied defendants' motions for summary judgment, finding the existence of genuine issues of material fact regarding whether the LDEQ letters of 2001 and 2002 provided constructive knowledge of tortious conduct and damage sufficient to commence the running of prescription. The defendants sought supervisory review of the adverse ruling in the Court of Appeal, Second Circuit. A unanimous panel of the court of appeal denied writs, explaining "[u]pon the showing made, the exercise of this Court's supervisory jurisdiction is not warranted." Hogg v. Chevron USA, Inc., 45,131(La. App. 2 Cir. 11/5/09) (unpublished).
Defendants Chevron and Young applied for supervisory review in this court.[4] We granted certiorari to consider whether the lower courts' denial of summary judgment was contrary to established law and jurisprudence. Hogg v. Chevron, USA Inc., 09-2632, 09-2635 (La.2/26/10), 28 So.3d 263.

DISCUSSION

Summary Judgment
Appellate courts review summary judgments de novo, using the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991). A court must grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." LSA-C.C.P. art. 966(B). The summary judgment procedure, which is designed to secure the just, speedy, and inexpensive determination of civil actions, is now favored in our law. LSA-C.C.P. art. 966(A)(2). Pursuant to that procedure:

*997 The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
LSA-C.C.P. art. 966(C)(2). As this court has explained, a "genuine issue" is a "triable issue," or one as to which reasonable persons could disagree. Champagne v. Ward, 03-3211, p. 5 (La.1/19/05), 893 So.2d 773, 777. A "material fact" is a fact, the existence or non-existence of which may be essential to a cause of action under the applicable theory of recovery. Id.
Although typically asserted through the procedural vehicle of the peremptory exception, the defense of prescription may also be raised by motion for summary judgment.[5]Doe v. Jones, 02-2581, p. 4 (La.App. 1 Cir. 9/26/03), 857 So.2d 555, 557; Labbe Service Garage, Inc. v. LBM Distributors, Inc., 94-1043, pp. 9-10 (La.App. 3 Cir. 2/1/95), 650 So.2d 824, 829; Lasseigne v. Earl K. Long Hospital, 316 So.2d 761, 762 (La.App. 1 Cir.1975); Duhon v. Boustany, 239 So.2d 180, 181 (La.App. 3 Cir.1970). See also, Alcorn v. City of Baton Rouge, Baton Rouge Police Department, 03-2682 (La.1/16/04), 863 So.2d 517. When prescription is raised by motion for summary judgment, review is de novo, using the same criteria used by the district court in determining whether summary judgment is appropriate.[6]Doe, 02-2581 at 4; 857 So.2d at 557-558.

Actual/Constructive Knowledge
The prescriptive period applicable to this case involving allegations of tortious conduct causing damage to immovable property is the one-year liberative prescription of LSA-C.C. art. 3493. Pursuant to this codal provision, the one-year period "commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage." LSA-C.C. art. 3493. Thus, the commencement of prescription under this article is triggered by actual or constructive knowledge of damage.
Constructive knowledge has been defined by our courts as whatever notice is enough to excite attention and put the injured party on guard or call for inquiry. Campo v. Correa, 01-2707, p. 12 (La.6/21/02), 828 So.2d 502, 510-511. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry might lead, and such information or knowledge as ought to reasonably put the injured party on inquiry is sufficient to start the running of prescription. Id. In assessing whether an injured party possessed constructive knowledge sufficient to commence the running of prescription, this *998 court's ultimate consideration is the reasonableness of the injured party's action or inaction in light of the surrounding circumstances. Id.; Griffin v. Kinberger, 507 So.2d 821, 824 n. 2 (La.1987).
Ordinarily, the party pleading the exception of prescription bears the burden of proving the claim has prescribed. However, when the face of the petition reveals that the plaintiff's claim has prescribed, the burden shifts to the plaintiff to show why the claim has not prescribed. Lima v. Schmidt, 595 So.2d 624, 628 (La.1992). This traditional allocation of the burden of proof is altered somewhat when prescription is raised through a motion for summary judgment rather than through the peremptory exception. In such a case, the movant is required to prove, based solely on documentary evidence and without the benefit of testimony at a hearing, that there is no genuine material factual issue in dispute regarding the date upon which the plaintiffs acquired actual or constructive knowledge of the damage sufficient to commence the running of prescription. Labbe Service Garage, 94-1043 at p. 10, 650 So.2d at 829.
In the instant case, defendants' summary judgment asserts that plaintiffs acquired actual and/or constructive knowledge of damage to their immovable property more than one year prior to the filing of suit on September 6, 2007, specifically, upon receipt of "Environmental Contamination Notification" letters sent from LDEQ to plaintiffs in December 2001 and April 2002. In support of their motion, defendants attached certified copies of the LDEQ letters and their enclosures, as well as excerpts from the deposition testimony of plaintiffs acknowledging plaintiffs received the letters and discussed their contents among themselves.[7] Drawing upon these documents, defendants argue that plaintiffs had knowledge, at least by 2002, that their property was contaminated by a gasoline plume emanating from Burt's Chevron, and that this knowledge of the cause, source, and existence of the contaminants was sufficient to commence the running of prescription.
Plaintiffs respond by arguing that the LDEQ letters did not put them on notice that the subsoil and groundwater of their property was contaminated; they contend that at most the letters informed them that ambient air samples had been taken and that they would be contacted "sometime in the future" if access to their land was necessary to determine the extent of the contamination. Plaintiffs maintain the 2006 letter requesting access to their property for the purposes of conducting remediation was the first notice they received of actual contamination, and it was this notice that triggered the commencement of prescription. To support their contention, plaintiffs attached excerpts from their depositions basically attesting to the plaintiffs' belief that the letters did not specifically inform them of contamination of their property; but only of an "investigation" being conducted that was "ongoing."
Plaintiffs' attachments opposing the summary judgment reveal that the crux of the dispute is the interpretation to be given to the LDEQ letters. Plaintiffs contend that nowhere in the letters are they specifically told their property is contaminated (actual notice); nor do the letters convey such information as would excite attention and call for further inquiry (constructive notice).
*999 Plaintiffs' contention, however, does not create a factual dispute as to their knowledge, i.e., what plaintiffs knew and when; that information is contained in the letters, which plaintiffs acknowledge receiving and reading.[8] Rather, the dispute in this case centers around whether the information conveyed in the letters was sufficient to commence the running of prescription. Thus, while the question of subjective knowledge is ordinarily inappropriate for resolution by summary judgment,[9] such a question is not presented here. In this case, there is no question as to what the plaintiffs knew and when.[10] Plaintiffs' knowledge is contained in the letters. The question presented is whether this knowledge constitutes actual or constructive knowledge sufficient to commence the running of prescription. Because there are no factual conflicts presented, only conflicting conclusions based on the facts (the LDEQ letters), this question is one appropriate for resolution by summary judgment. See, Smith v. Our Lady of the Lake Hospital, Inc., 93-2512, p. 29 (La.7/5/94), 639 So.2d 730, 752 ("[S]ummary judgment is appropriate when all the relevant facts are marshalled before the court, the marshalled facts are undisputed, and the only issue is the ultimate conclusion to be drawn from those facts.").
A review of the LDEQ letters attached to the motion for summary judgment reveals the first letter, dated December 20, 2001, is titled "Environmental Contamination Notification." The letter recites, in pertinent part: (1) "environmental contamination has been detected in the vicinity of Burt's Chevron;" (2) "[g]asoline contamination has been detected in the subsurface and groundwater as a result of a leaking underground storage tank system;" (3) "[t]he direction of groundwater flow in this area is in a west-northwesterly direction toward an unnamed stream;" (4) "LDEQ collected water samples from the stream indicating the presence of chemicals commonly found in gasoline;" (5) "[d]ue to the direction of groundwater flow, there is a possibility that gasoline may have migrated underground from the Burt's Chevron site to *1000 your property or that such migration may occur in the future;" (6) LDEQ is "in the process of contracting with a company to further investigate the area;" and (7) "[y]ou may be contacted in the future requesting permission to access your property to determine the extent of the contamination."
The second letter, dated April 26, 2002, recites: (1) LDEQ recently collected ambient air samples adjacent to an unnamed stream located down gradient from Burt's Chevron; (2) the results of the samples are enclosed, along with information "regarding the potential health impacts of the chemicals detected as well as a site diagram depicting the sampling locations;" (3) based on an evaluation of the test results "it is recommended that you limit the time that you spend in the area immediately adjacent to the stream;" and (4) LDEQ is in "the final stages of finalizing a contract for the remediation of the release."
A plain reading of the letters reveals they clearly and unambiguously inform plaintiffs of an underground storage tank leak at Burt's Chevron which released a gasoline plume into the subsurface soil and groundwater that was migrating in a west-northwesterly direction and may have already migrated or may in the future migrate to plaintiffs' property; that gasoline contaminants had been detected in the water and air of an unnamed stream; and that the results of sampling indicated the presence of contaminants at such levels that LDEQ recommended plaintiffs limit the time spent near the stream. Plaintiffs admit, and the evidence discloses, their property is located west/northwest of Burt's Chevron, and the unnamed stream referenced in the letters is located on plaintiffs' property.
Although plaintiffs acknowledge receipt of the letters, they contend the information relayed therein conveys neither actual nor constructive notice of tortious conduct and damage sufficient to commence the running of prescription. To this end, plaintiffs argue that it would not have been reasonable for them to file suit in 2002, when they received the letters, as the letters provide no definitive evidence of contamination, or whether that contamination exceeded acceptable limits. They contend the information conveyed is vague and since the letters indicate the investigation is ongoing, it was reasonable to await further notice from LDEQ before taking action.
A reading of the letters belies this contention. In the letters, plaintiffs were advised the stream running through their property contained contaminants, both in the water and the surrounding air. They were specifically cautioned to limit their time around the stream, an undeniable indication of unacceptable levels of contamination. The results of the ambient air samplings indicating the precise levels of each chemical detected and a memorandum detailing the potential adverse health effects of the chemicals accompanied the 2002 letter. In addition, a plat illustrating the locations from which samples were taken was included. That plat demonstrated that samples were extracted from plaintiffs' property. Plaintiffs were specifically advised by LDEQ they may be contacted in the future for permission to access their property to determine "the extent" of the contamination, not to determine whether there was any contamination. Whereas the 2001 letter informed plaintiffs LDEQ was in the process of contracting with a company to further investigate the area, the 2002 letter disclosed it was in the process of finalizing a contract for the remediation of the release, a clear indication that matters had advanced beyond mere investigation of the area to corrective *1001 action to remedy damage caused by the contamination.
Nonetheless, plaintiffs insist that although the letters may have indicated the presence of contaminants in the surface water and air, the LDEQ letters gave them no indication the contamination was the result of soil or groundwater contamination on their property. This argument is unavailing as the letters clearly indicate the presence of damage in the form of undesirable levels of gasoline contaminants on the property. It is firmly established that, in cases in which a plaintiff suffers some but not all of his damages, prescription runs from the date on which he first suffers actual and appreciable damage, even though he may thereafter come to a more precise realization of the damages he has incurred or incur further damage as a result of the completed tortious act. Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354 (La.1992). Moreover, because the contamination of the air, surface water, groundwater, and soil resulted from the same tortious actthe leaking underground storage tanksthere was but one cause of action.
In the final analysis, a plain reading of the LDEQ letters reveals that while it is arguable that the letters do not, as the district court concluded, specifically inform plaintiffs that the soil and groundwater on their property is contaminated, it is beyond peradventure that they provide sufficient information to excite attention and put plaintiffs on guard and call for inquiry. Plaintiffs are informed in the letters that leaking underground storage tanks at Burt's Chevron had contaminated the subsurface soil and groundwater in the area, that the direction of groundwater flow was toward plaintiffs' property, that water samples taken from the unnamed stream on the plaintiffs' property contained gasoline constituents and that gasoline constituents had been detected on the property in such concentrations that it was recommended that plaintiffs limit the time spent in the area. Clearly, such information as that relayed in the letters was sufficient to excite attention and put a reasonable person on guard to call for inquiry, which is the essence of constructive knowledge.
While prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong, and should not be used to force a person who believes he may have been damaged in some way to rush to file suit, a plaintiff is responsible to seek out those whom he believes may be responsible for a specific injury. Jordan v. Employee Transfer Corporation, 509 So.2d 420, 423 (La.1987). In a case involving constructive knowledge, the time when prescription begins to run depends on the reasonableness of a plaintiff's action or inaction. Id. In this case, we find that with the receipt of the LDEQ letters in 2001 and 2002, plaintiffs had sufficient knowledge to afford them a reasonable basis to pursue a claim for damages, and that the plaintiffs' inaction in light of such knowledge was unreasonable. This conclusion is underscored when the allegations of the 2007 petition for damages are examined. The facts that form the basis of the claims asserted in the petition are the same facts contained in the 2001 and 2002 letters.
With the receipt of the second letter from LDEQ in 2002, the plaintiffs acquired constructive knowledge of the damage to their immovable property sufficient to commence the running of prescription based on LSA-C.C. art. 3493. The plaintiffs' suit, filed more than five years later, in 2007, is prescribed unless there is merit to plaintiffs' alternative arguments that the presence of gasoline on their property is a continuing trespass on which prescription *1002 does not begin to run until the trespass is abated or that the defendants' failure to contain/remediate the release of gasoline suspends the running of prescription.

Continuing Trespass
Plaintiffs counter the argument that they acquired constructive knowledge of the contamination and damage to their property with the receipt of the 2001 and 2002 letters from LDEQ, yet failed to file suit within one year of acquiring this knowledge, by urging the conduct that gives rise to their tort claims is the presence of gasoline on their property, the presence of this contaminant constitutes a continuous trespass, and, as a result, prescription does not begin to run until the trespass is abated by the removal of the gasoline from the property. Defendants respond by arguing the conduct on which plaintiffs base their claims is not the presence of the gasoline on their property, but the leaking underground storage tanks (which allowed the gasoline to migrate to plaintiffs' property), conduct which ceased in 1997 when the tanks were replaced, and, as a result, the continuing trespass/continuing tort doctrine does not apply to delay the commencement of prescription.
Plaintiffs' argument is premised on the proposition that the underground migration of toxic substances from neighboring property constitutes a trespass,[11] and that all trespasses are, by definition, continuous in nature, preventing the running of prescription as long as the trespass continues.[12]
A suit seeking damages for trespass is an action in tort. Bennett v. Louisiana Pacific Corporation, 29,598, p. 2 (La.App. 2 Cir. 5/9/97), 693 So.2d 1319, 1321, writ denied, 97-1552 (La.10/3/97), 701 So.2d 199. As a tort action, it is subject to the one-year liberative prescription of LSA-C.C. arts. 3492 and 3493. In cases involving damage to immovable property based on LSA-C.C. art. 3493, Louisiana jurisprudence draws a distinction between damages caused by continuous, *1003 and those caused by discontinuous, operating causes:
When the operating cause of the injury is continuous, giving rise to successive damages, prescription begins to run from the day the damage was completed and the owner acquired, or should have acquired, knowledge of the damage. See South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531 (La.1982), and cases cited therein. When the operating cause of the injury is discontinuous, there is a multiplicity of causes of action and of corresponding prescriptive periods. Prescription is completed as to each injury, and the corresponding action is barred, upon the passage of one year from the day the owner acquired, or should have acquired, knowledge of the damage. See A.N. Yiannopoulos, Predial Servitudes, § 63 (1982).
Official Revision Comments (c) to LSA-C.C. art. 3493 (1983). The distinction between continuous and discontinuous operating causes was clarified by this court in Crump v. Sabine River Authority, 98-2326 (La.6/29/99), 737 So.2d 720, a property damage case, in the context of discussing continuing torts in general. Therein, we explained that "[a] continuing tort is occasioned by [continual] unlawful acts, not the continuation of the ill effects of an original, wrongful act." Crump, 98-2326 at 9, 737 So.2d at 728. Further, we point out that "[t]he continuous conduct contemplated in a continuing tort must be tortious and must be the operating cause of the injury." Crump, 98-2326 at 11, 737 So.2d at 729 n. 7. The inquiry is essentially a conduct-based one, asking whether the tortfeasor perpetuates the injury through overt, persistent, and ongoing acts.
In Louisiana, the concept of continuing tort finds its origins in trespass and nuisance cases.[13]In re Medical Review Panel for the Claim of Moses, 00-2643, p. 15 (La.5/25/01), 788 So.2d 1173, 1183. Under Louisiana law, a trespass can be continuous or it can terminate. Kling Realty Company, Inc. v. Chevron USA Inc., 575 F.3d 510, 519 (5th Cir.2009). A continuous trespass is a continuous tort; one where multiple acts of trespass have occurred and continue to occur; where the tortious conduct is ongoing, this gives rise to successive damages. See, e.g., Perrilloux v. Stilwell, 00-2743 (La.App. 1 Cir. 3/28/02), 814 So.2d 60 (continuing trespass found where neighbor continued to use driveway that encroached on landowner's property, depriving landowner of peaceful enjoyment of property on a successive, day-to-day basis). That situation, our courts have cautioned, is to be distinguished from a trespass which causes continuing injury by permanently changing the physical condition of the land. When a trespass which permanently changes the physical condition of the land is concluded, no additional causes of action accrue merely because the damage continues to exist or even progressively worsens. Derbofen v. T.L. James & Company, Inc., 355 So.2d 963, 968 (La.App. 4 Cir. 1977), writ denied, 357 So.2d 1156, 1168 (inadvertent excavation of fill material from landowner's property to create lake extending over and onto landowner's property not a continuing trespass after dredging operation completed).
Thus, contrary to plaintiffs' assertion in brief, all trespasses are not, by definition, continuous acts giving rise to successive damages. To determine whether a trespass is continuous, a court must *1004 engage in the same inquiry used to determine the existence of a continuing tort; i.e., the court must look to the operating cause of the injury sued upon and determine whether it is a continuous one giving rise to successive damages, or whether it is discontinuous and terminates, even though the damage persists and may progressively worsen.
In the present case, the plaintiffs maintain that the continued presence of gasoline on their property, coupled with the defendants' failure to remove the contaminant, fulfills the requirements of a continuing trespass. They cite Estate of Patout v. City of New Iberia, 01-0151 (La.App. 3 Cir. 4/3/02), 813 So.2d 1248, writ denied, 02-1172, 02-1231(La.6/21/02), 819 So.2d 335, 336, as support for this proposition. In Patout, private landowners neighboring a city-operated landfill sued the city for damages resulting when the city pushed garbage beyond the borders of its landfill and onto the plaintiffs' property. In overruling a district court ruling sustaining peremptory exceptions of prescription, the court of appeal held that the continued presence of garbage on the plaintiffs' property constituted a continuing trespass and that prescription would not begin to run until the garbage was removed. Patout, 01-0151 at 2-3, 813 So.2d at 1250. Plaintiffs insist that the gasoline in the soil and groundwater of their property is analogous to the garbage placed on the landowner's property in Patout, and that, as a result, the defendants' conduct constitutes a continuing trespass on which prescription does not begin to run until the gasoline is removed.
As framed, the issue is whether the presence of contaminants on plaintiffs' property resulting from a leaking underground storage tank on neighboring property constitutes a continuing trespass/continuing tort. In resolving this issue, we are guided, under the facts of the instant case, by prior jurisprudence, and in particular by our decision in South Central Bell Telephone Company v. Texaco, Inc., 418 So.2d 531 (La.1982). In that case, the plaintiff filed suit for damage to underground telephone cables caused by gasoline leaking from storage tanks located on nearby properties. The gasoline was alleged to have originated from tanks owned and maintained by Texaco and from tanks owned and maintained by Shell. The Texaco tanks were replaced in 1971, after which there were no reports of leakage. The Shell tanks were replaced in 1975. Plaintiff filed suit in 1975, and was met with an exception of prescription which was sustained by the district court on grounds that the damage was complete, and prescription commenced to run, when plaintiff made the decision to replace the cable, more than one year prior to the filing of suit. On review, this court concluded that the damage to the cables continued until the Shell tanks were replaced in 1975, and that the suit against Shell, filed that same year, was timely. However, because the Texaco tanks were replaced in 1971 and there was no indication of leakage thereafter, the suit against Texaco was held to have prescribed. In reaching its conclusion, the court noted that "[w]here the cause of the injury is a continuous one giving rise to successive damages, prescription dates from cessation of the wrongful conduct causing the damage." South Central Bell Telephone, 418 So.2d at 533. In South Central Bell Telephone, the "wrongful conduct causing the damage," i.e., the operating cause of the damage, was determined to be the leaking underground storage tanks. The operating cause of the damage abated when the offending tanks were removed and replaced.
*1005 Following the South Central Bell Telephone decision, the Court of Appeal, First Circuit was confronted with a similar situation involving a lawsuit filed by a landowner seeking damages for the deposit of toxic and hazardous waste on his property. Mouton v. State of Louisiana, 525 So.2d 1136 (La.App. 1 Cir.), writ denied, 526 So.2d 1112 (1988). In that case, knowledge of the damage was acquired by the landowner when he was made a defendant in a suit by neighboring landowners. In opposing an exception of prescription, the landowner argued (similarly to the plaintiffs in this case) that the operating cause of the damage to his property was the presence of the hazardous substances on the property, and that the presence of the hazardous and toxic wastes was a continuous tort on which prescription did not commence to run until the substances were removed. Following our decision in South Central Bell Telephone, the court of appeal rejected the argument that the operating cause of the landowner's damage was the presence of the hazardous waste on his property; rather, the court of appeal found that the operating cause of damage was the deposit of waste on the land. Since that conduct had ceased more than one year before suit was filed, the suit was held to be prescribed. Mouton, 525 So.2d at 1142.
Likewise, in LeJeune Brothers, Inc. v. Goodrich Petroleum, Co., L.L.C., 06-1557 (La.App. 3 Cir. 11/28/07), 981 So.2d 23, writ denied, 08-0298 (La.4/4/08), 978 So.2d 327, the court of appeal rejected a landowner's argument that the failure to remove oilfield exploration and production waste wrongfully deposited on the landowner's property constituted a continuing tort. As in Mouton, the court determined that the cause of the injurythe operating cause of damagewas the disposal of waste into the property, not the failure to remove it.
In reaching this conclusion, the LeJeune court drew heavily upon this court's decision in Crump, supra. In Crump, the court held that the continued presence of a canal on property of a third party, which had drained all the water from an ox-bow lake on the plaintiff's property, was not a continuous tort. In making this determination, the court explained:
In the instant case, the plaintiff similarly argues that the mere existence of the canal is the operating cause of daily injury because the effect of its presence is the continuous diversion of the flow of water away from the ox-bow. Relying on our prior decision in Griffin [v. Drainage Commission of New Orleans, 110 La. 840, 34 So. 799 (1903)], however, we find that the actual digging of the canal was the operating cause of the injury. The continued presence of the canal and the consequent diversion of water from the ox-bow are simply the continuing ill effects arising from a single tortious act.
Crump, 98-2326 at 9, 737 So.2d at 727-728.
In each of the above cases, the courts looked to the alleged injury-producing conduct of the tortfeasors to determine whether that conduct was perpetuated through overt, persistent, and ongoing acts. Where the wrongful conduct was completed, but the plaintiff continued to experience injury in the absence of any further activity by the tortfeasor, no continuing tort was found.
A similar analysis applies in this case. The plaintiffs' petition alleges the defendants breached their duty to surrounding property owners by allowing large quantities of gasoline to leak from the underground storage tanks over a period of years (specifically, from 1984 to 1996) and migrate onto plaintiffs' property. According *1006 to the petition, the presence of gasoline on the plaintiffs' property (which plaintiffs characterize as a trespass) has caused damage in the form of diminution in the property's value, stigma, and loss of enjoyment of use of the property. Consistently with the decisions in South Central Bell Telephone, Mouton and LeJeune, we find that the operating cause of the injury under these allegations was the leaking underground storage tanks, not the current presence of the gasoline on plaintiffs' property.[14] As in Crump, the presence of the gasoline in the soil and subsurface is simply the continued ill effect of the original tortious incident  the leaking of gasoline, which ceased in 1997 when the tanks were replaced.[15]
Under the factual allegations of plaintiffs' petition, the trespass, if indeed there was one,[16] is simply not a continuing one. The presence of gasoline on plaintiffs' property is the continuing effect of prior wrongful conduct which occurred on neighboring property.[17] The plaintiffs' pleadings contain no allegation of leaking after 1996. In other words, there are no allegations of new conduct after the initial leakage ceased. There was a discrete encroachment which was not repeated after the tanks were replaced and which allegedly resulted in permanent harm to plaintiffs' property.[18] Because the operating cause of the injurythe damage-causing conductis not continuing, there is no continuing tort. As a result, the theory of continuous trespass/continuous tort cannot operate to suspend the running of prescription.

Failure to Contain/Remediate
Plaintiffs alternatively argue that the defendants' failure to participate *1007 in and/or cooperate with LDEQ's efforts to contain/remediate the migrating gasoline before it reached plaintiffs' property is an act of negligence separate and apart from the failure to prevent the leak in the first place and that knowledge of that negligence was not communicated in the LDEQ letters. This argument is without merit because the 2001 and 2002 letters from LDEQ provided constructive knowledge of damage to plaintiffs' immovable property sufficient to commence the running of prescription based on LSA-C.C. art. 3493, regardless of whether that damage resulted from the failure to prevent the storage tanks from leaking or the failure to contain/remediate the leakage before it reached plaintiffs' property. As explained by this court in Crump, the breach of a duty to right an initial wrong simply cannot be a continuing wrong that suspends the running of prescription, as that is the purpose of every lawsuit and the obligation of every tortfeasor. Crump, 98-2326 at 10, 737 So.2d at 729. It was not the failure to contain/remediate that initially caused plaintiffs' damages, but the leaking underground storage tanks. Consequently, the defendants' failure to contain/remediate the leak did not suspend the running of prescription.

CONCLUSION
In conclusion, we find plaintiffs acquired constructive knowledge of the damage to their immovable property sufficient to commence the running of prescription no later than 2002. Because plaintiffs failed to establish continuing tortious conduct on the part of defendants, the doctrine of continuing trespass/continuing tort does not apply to delay the commencement of prescription on plaintiffs' claims. Accordingly, plaintiffs' action, filed more than five years after prescription commenced to run, is prescribed. The judgment of the district court denying the motions for summary judgment filed by defendants Chevron and Young is therefore reversed. This matter is remanded to the district court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
JOHNSON, J., dissents.
KNOLL, J., dissents and assigns reasons.
KNOLL, J., concurring in part and dissenting in part.
I join that portion of the majority opinion regarding plaintiffs' actual or constructive notice. The contamination warning letters from the DEQ should have placed a reasonable person on notice of contamination on their property.
With all due respect, I dissent from the majority's discussion of the continuing tort claim. The question before this Court is whether the continuing presence of noxious chemicals under the plaintiffs' land constitutes an ongoing wrongful act, or is merely an ongoing injury resulting from a prior wrongful act (i.e., the leaking gas tank). In accord with both the Civil Code and this Court's longstanding precedent, I would find the existence of an abatable noxious chemical under another person's land constitutes a continuing tort and tolls prescription.
In my view, the majority opinion is fatally flawed in not recognizing that successive damages are daily occurring from the trespass on plaintiffs' property from defendants' undisputed leakage of toxic chemicals. The offending chemicals are so toxic, they present a danger not only to property, but to human and animal health, which the state by law requires remediation of such property. With the presence of these toxic chemicals on plaintiffs' property, *1008 the majority opinion very dismissively states:
As in Crump, the presence of the gasoline in the soil and subsurface is simply the continued ill effect of the original tortious incident  the leaking of gasoline which ceased in 1997 when the tanks were replaced.
Crump v. Sabine River Authority, 98-2326 (La.6/29/99), 737 So.2d 720, concerned the presence of a canal and the draining of water, not toxic chemicals that are daily causing successive damages. I further find the majority opinion's rationale for the tort of trespass confusing in that its reasoning is based upon the leaking tanks. Specifically, the majority opinion concludes by stating:
Under the factual allegations of plaintiffs' petition, the trespass, if indeed there was one, is simply not a continuing one. The presence of gasoline on plaintiffs' property is the continuing effect of prior wrongful conduct which occurred on neighboring property. The plaintiffs' pleadings contain no allegation of leaking or seepage after 1996. In other words, there are no allegations of new conduct after the initial leakage ceased. There was a discrete encroachment which was not repeated after the tanks were replaced and which allegedly resulted in permanent harm to plaintiffs' property. Because the operating cause of injury  the damage-causing conductis not continuing, there is no continuing tort. As a result, the theory of continuing trespass/continuous tort cannot operate to suspend the running of prescription.
The "prior wrongful conduct" referred to in this passage, i.e., the leaking tanks, is not what plaintiffs' claim is based upon. Plaintiffs would have no right to sue defendants because their tanks leaked. Plaintiffs are suing defendants because defendants' toxic substances trespassed upon their property causing successive damages to their land as long as the trespass continued. The majority opinion is centered around the initial wrongful conduct and the damages as simply the "continued ill effect of the tortious conduct" which ceased in 1997 when the tanks were replaced. This view does violence to environmental contamination issues and will impact future litigation in this area.

A. The Continuing Tort Doctrine in Louisiana Law

The continuing tort doctrine provides that, when a tort occurs over a period of time, prescription does not begin to run until the defendant's harmful action has ceased. The relevant prescriptive period for a claim involving damage to immovable property is found in Civ.Code art. 3493:
When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage.
Although the continuing tort doctrine is not explicitly set forth in Civil Code art. 3493, it is fairly implied in that article's concept of damage. To determine when prescription begins to run under article 3493, a court first must determine when the "damage is caused" to the immovable property. In other words, when the plaintiff continues to suffer further damages to his property flowing from the initial tortious act, the tort continues. The continuing tort doctrine recognizes that, in some circumstances, there is no single wrongful act that "causes" the damage. Instead, there are continuous or repeated wrongful acts, each of which creates a new harm. Until those wrongful acts cease, prescription does not run.
This Court has long held where "the damages claimed are predicated on alleged *1009 continuous wrongful acts, causes which are supposed to occur daily, and to produce effects daily repeated ... `prescription, whatever the length of time, has no application.'" Di Carlo v. Laundry & Dry Cleaning Service, 178 La. 676, 152 So. 327, 329 (1933)(quoting Northwestern Fertilizing Co. v. Hyde Park, 97 U.S. 659, 668-69, 24 L.Ed. 1036 (1878)). A continuing tort exists "where the operating cause of injury is a continuous one and gives rise to successive damages." Crump v. Sabine River Authority, 98-2326, p. 7 (La.6/29/99), 737 So.2d 720, 726. This is distinguished from a "continuation of the ill effects of an original, wrongful act," which does not create a continuing tort. Id. at 728. The crucial distinction is between an ongoing wrongful act, which tolls prescription, and mere ongoing damages, which do not. The majority holds the "operating cause of injury" is the leaking tanks, which were admittedly repaired several years before the filing of this lawsuit. I disagree. The proximate cause of plaintiffs' injury is the continued existence of noxious chemicals underneath their property. Until those chemicals are removed, plaintiffs will continue to suffer additional harm, and the tort will not prescribe.
Crump v. Sabine River Authority, supra, is this Court's leading case on continuing torts. In Crump, a canal dug on neighboring land drained a nearby bayou, thereby drying up plaintiff's waterfront property and preventing her from accessing Toledo Bend Lake. Id. at 723. Plaintiff did not sue until nearly 20 years after the canal was dug. Plaintiff argued the continued existence of the canal on her property, and her continued inability to access the lake, created a continuing tort and tolled prescription. Defendant countered that there was only one unlawful act, the construction of the canal, and prescription began to run from the date the canal was completed. Id. at 726. The Court held for defendant, relying on Griffin v. Drainage Commission of New Orleans, 110 La. 840, 34 So. 799 (1903), which also involved the unlawful digging of a canal. The Griffin court held, even though the damages continued up to the time suit was filed, "the cause of the injury arose, produced injury, and ceased," and prescription began to run the day the canal was complete. Id. at 801.

B. Trespass[1]
The law of trespass is based on the "fundamental sanctity of private property from arbitrary invasion." Loeblich v. Garnier, 113 So.2d 95, 106 (La.App. 1 Cir. 1959)(Tate, J.) This Court has held "[a]ny unlawful physical invasion of another's property is a `trespass.'" Gliptis v. Fifteen Oil Co., 204 La. 896, 16 So.2d 471, 474 (1943). Trespass is not limited to intrusions on the surface of the land, but includes subterranean trespasses as well. Id.
The essence of trespass is the unlawful invasion of a person or object on the property of another. Perrilloux v. Stilwell, 00-2743 (La.App. 1 Cir. 3/28/02), 814 So.2d 60, 63. The "wrongful act" of trespass is not merely entering another's property, but remaining there. Bellard v. Biddle, 98-1502 (La.App. 3 Cir. 3/17/99), 734 So.2d *1010 733, 735; Williams v. City of Baton Rouge, 96-0675 (La.App. 1 Cir.1998), 715 So.2d 15, 24. This is made explicit in the statute defining criminal trespass, which forbids "remain[ing] in or upon property, movable or immovable, owned by another without express, legal, or implied authorization." La.Rev.Stat. § 14:63(C).
Consistent with these general principles, Louisiana appellate courts have routinely held trespasses to be a continuing tort. In Estate of Patout v. City of New Iberia, which resulted in several published opinions,[2] the city of New Iberia operated a landfill that spilled garbage onto plaintiffs' property. The trial court denied the city's exception of prescription, and the Third Circuit affirmed on the grounds that the city's failure to remove the trash from the property constituted a continuing tort: "the City's trespass on the plaintiffs' immovable property continues by virtue of its failure to remove the deposited garbage.... debris or other objects placed on another's property constitutes a continuing trespass and prescription does not apply until the offending acts are abated." Id. at 1252-53, citing Dore v. Jefferson Guaranty Bank, 543 So.2d 560, 562 (La.App. 4 Cir.1989)(Litter on plaintiff's land constitutes a "continuing trespass"); Terral v. Poole, 484 So.2d 227, 228 (La.App. 3 Cir.1986)(Sewer line wrongfully installed on plaintiff's property, along with pile of debris, constitute continuing trespasses whether or not the sewer line is in use).
Estate of Patout was cited with approval in Lopez v. House of Faith Non Denomination Ministries, 09-1147 (La.App. 4 Cir. 1/13/10), 29 So.3d 680. Lopez involved a building on defendant's land that was damaged by Hurricane Katrina and eventually fell onto plaintiffs' house. Id. at 681. The trial court held prescription began to run on the date the defendant's building first made contact with plaintiffs' home. The court of appeals reversed, finding there was a continuing tort and prescription did not begin to run as long as the building "remained in physical contact with Plaintiffs' house." Id. at 684.
In Cooper v. Louisiana Department of Public Works, 03-1074 (La.App. 3 Cir. 3/3/04), 870 So.2d 315, the Corps of Engineers built a series of locks and dams on the Ouachita River, causing significant flooding upstream as water backed up in the Ouacita's tributaries.[3]Id. at 320. The court found the continued existence of water on plaintiffs' land created a continuing tort, and prescription did not begin to run until the water was drained. Id. at 323. See also Freestate Industrial Dev. Co. v. T & H, Inc., 188 So.2d 746 (La.App. 2 Cir.1966).
The rule set forth in trespass cases is simple: "the wrong continues as long as *1011 the offending object remains." Lopez v. House of Faith Non-Denomination Ministries, 09-1147 (La.App. 4 Cir. 1/13/10), 29 So.3d 680, 684. As clearly explained in Tujague v. Atmos Energy Corp., 442 F.Supp.2d 321, 325 (E.D.La.2006):
Atmos owed Tujague a duty not to trespass upon his property. Atmos breached this duty when it placed the pipeline and debris upon Tujague's property without his permission, and the breach continued until those items were removed. The trespass was a continuing tort and did not cease, and prescription did not begin to run, until the pipeline and debris were removed from Tujague's property.
I would apply that rule to the present case. It is undisputed that the noxious chemicals leaked from defendants' gas tanks remain under plaintiffs' land, thereby breaching defendant's duty not to trespass. Although these chemicals are invisible, they are nonetheless corporeal and therefore capable of causing a trespass, as they "have a body ... and can be felt or touched." Civ.Code art. 461. See McNamara v. Stauffer Chemical Co., 506 So.2d 1252, 1258 (La.App. 1 Cir.1987), writ denied, 512 So.2d 454, 455 (La.1987)(sulfuric acid is a corporeal movable); McNamara v. John E. Chance & Associates, Inc., 491 So.2d 154, 157 (La.App. 3 Cir.1986)(diesel fuel is a corporeal movable.)
Although this Court has not explicitly stated that trespass is imprescriptable until the offending object is removed, that holding is fairly implied by our decision in Young v. International Paper Co., 179 La. 803, 155 So. 231 (La.1934), a chemical contamination case where defendant's paper mill leaked acid water onto plaintiff's land and destroyed his timber. The trees died more than one year before suit was filed, but the acid water remained on the land. Id. at 233. Although the Court held any claims for destruction of the timber were time-barred, we recognized "damages caused by standing water may continue to be inflicted as long as the water covers the land" and claims based on those damages had not prescribed. Id. Although the phrase "continuing trespass" had not yet entered this Court's legal lexicon in 1934, Young shows that an unabated trespass has long been held a continuing tort in Louisiana law.[4]

C. South Central Bell v. Texaco

Defendants argue this case is controlled by South Central Bell v. Texaco, 418 So.2d 531 (La.1982), in which an underground gasoline leak caused severe damage to plaintiff's telephone cables. Plaintiff, SCB, began to notice gasoline in its manholes in 1971, and the nearby Texaco station replaced its leaky tanks. The parties assumed the problem was solved as the remaining gasoline would eventually drain away from the cables and the damage would naturally subside. Id. at 532. However, the gasoline did not disappear, and SCB continued pumping gas out of the manholes on a regular basis. In September 1974, SCB replaced all cable in the area due to the gasoline corrosion. Id. SCB then discovered the gasoline in the manholes actually came from leaking tanks at *1012 a nearby Shell station. SCB filed suit in October 1975. Shell's tanks were replaced in December 1975, and the problem subsided thereafter. Id. at 533.
The trial court held the existence of the gasoline contaminating the cables was a continuing tort, and prescription began to run in September 1974 when the cables were replaced. The trial court reasoned the extent of SCB's damage was the cost of replacing the cables, and no additional damages were suffered after their replacement. Plaintiff appealed, arguing that prescription did not begin to commence as long as the cause of the damages (i.e., the gasoline) remained underground. The court of appeal affirmed on the grounds that once the old cables were irreparably damaged and had to be replaced, the additional gasoline leakage did not cause any more damage.[5]
This Court reversed and held prescription did not begin to run until December 1975, when Shell replaced its leaky tanks and the gasoline drained away. The court reasoned, "[w]hen the tortious conduct and resulting damages continue, prescription does not begin until the conduct causing the damage is abated." Id. at 533. Defendants claim South Central Bell establishes a rule that prescription begins to run when a polluter replaces leaky gasoline tanks.
However, in South Central Bell it was undisputed that replacing the tanks resolved the issue. The gasoline drained away from the telephone lines shortly thereafter, and no additional remediation was necessary. The successive damages ceased. In the case before us, gasoline remains on the Hoggs' property several years after defendants' leaky tanks were replaced. Indeed, the chemicals may not have even migrated onto plaintiffs' property until some time after the leak was stopped. Moreover, South Central Bell did not argue, as do the Hoggs, that a continuing tort exists until the gasoline is removed, or that the gasoline created a continuing trespass. Those issues were simply not before the court in South Central Bell. Importantly, "[j]udicial decisions do not stand as binding `precedent' for points that were not raised, not argued, and hence not analyzed." Legal Services Corp. v. Velazquez, 531 U.S. 533, 557, 121 S.Ct. 1043, 1057, 149 L.Ed.2d 63, 82 (2001)(Scalia, J., dissenting)(collecting cases). It would be improper to extend the holding of South Central Bell to a legal argument that was not made by either party in that case.

D. Out of State Authority

As explained above, the continuing tort doctrine is wholly consistent with the Civil Code and this Court's long held jurisprudence. However, the concept is not unique to Louisiana, and the out of state jurisprudence warrants review as persuasive authority.
Perhaps the most comprehensive discussion of chemical contamination as a continuing tort is Hoery v. U.S., 64 P.3d 214 (Colo.2003). A nearby Air Force base negligently released toxic chemicals from 1940 through 1994, and the chemicals migrated under plaintiffs' land. Hoery knew of the contamination in 1995, but did not sue until 1998, after the claim had facially prescribed. Id. at 217. The federal district court held for defendant, finding "the only `wrongful act' alleged by Hoery was the actual release of toxic chemicals by the United States." Id. The Tenth Circuit sent a certified question to the Colorado Supreme Court, which was called upon to *1013 decide whether the "ongoing presence of those toxic chemicals on plaintiff's property constitute continuing trespass and/or nuisance" and tolled the statute of limitations. Id. at 215.
The Colorado Supreme Court held for plaintiff, as the defendant's "tortious conduct is not limited to the initial release of those chemicals." Id. at 216. Instead, an "actor's failure to remove a thing tortiously placed on another's land is considered a `continuing trespass' for the entire time during which the thing is wrongfully placed on the land.... Until the thing tortiously placed on the land, or underneath the land, is removed, then liability for trespass remains." Id. at 218, citing Restatement (Second) of Torts § 161 cmt. B; 75 Am.Jur.2d Trespass § 26. As a result, the "migration and presence of toxic chemicals on his property were in themselves wrongful acts for which the United States was responsible." Id. at 217.
The Colorado court convincingly distinguished its earlier cases, similar to Crump, involving irrigation ditches and canals. Earlier Colorado courts found prescription began to run when the ditch or canal was complete.[6] The Hoery court distinguished those cases, which were based on the fact the ditch served a useful purpose and "defendants, with lawful authority, constructed a socially beneficial structure intended to be permanent." Id. at 220. Of course, there is no "socially beneficial" use to the chemicals currently contaminating the Hoggs' property.
The basic holding of the Hoery case is "[t]he failure of the United States to remove the pollution from Hoery's property which it wrongfully placed there constitutes a continuing property invasion for the entire time the contamination remains." Id. at 222. Several other courts have reached the same result. See Nieman v. NLO, Inc., 108 F.3d 1546, 1556-57 (6th Cir.1997)(Although discharge of uranium was years ago, plaintiff may bring claim for resulting contamination to his land. However, plaintiff can only recover for damages suffered within four year prescriptive period); Arcade Water Dist. v. U.S., 940 F.2d 1265 (9th Cir.1991)(Although defendant stopped operating pollution laundromat years before, tort was continuing as long as chemicals leached into plaintiff's water supply); State of Florida v. Fleet Credit Corp., 691 So.2d 512, 514 (Florida Dist. Ct.App.1997)(In "groundwater pollution cases, it is the ongoing contamination, not the initial disposal of wastes, that constitutes a continuing, but abatable, nuisance"); Taylor v. Culloden Public Service Dist., 214 W.Va. 639, 591 S.E.2d 197, 204 (2003) ("as long as the arsenic remains on the Kermit Lumber business site ... and as long as the arsenic is flowing into the Tug Fork River, the harm or nuisance continues"); In re ASARCO/Vashon-Maury Island Litigation, 2001 U.S. Dist. LEXIS 7154 at *12-15 (W.D.Wash.2001)(Soil contamination "claims are not barred by the statute of limitations so long as the intruding substance remains in the ground.")
Notably, the federal Fifth Circuit has not adopted this rule. In the recent decision of Kling Realty Co. v. Chevron USA Inc., 575 F.3d 510 (5th Cir.2009), the Fifth Circuit held chemical contamination from a closed oil well was not a continuing tort. Although the court noted Louisiana law recognizes the doctrine of continuing trespass, it held the "contamination of the Kling/Walet property caused by Chevron is the continuing effect of prior conduct; the soil damage is unlike dumping garbage *1014 or litter on another's property." Id. at 519. First, it is not clear that Kling is on point. In Kling, plaintiff's primary claim was based on a lease dating from 1970. The lease ended in 1973, and the parties entered into a full "release of claims associated with the Well and any pit, tank battery, or other piece of equipment associated with the Well." Id. at 512. The existence of a signed release is highly relevant, as the court held that the three year statute of limitations began to run from the date the release was signed.
To the extent that Kling is on point, I believe the Fifth Circuit is in error. This Court is the "ultimate arbiter of the meaning of the laws of this state." Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc., 06-0582 (La.11/29/06), 943 So.2d 1037, 1045. Although we carefully consider federal district and appellate court decisions, we are not bound to follow them. Chittenden v. State Farm Mutual Auto. Ins. Co., 00-414 (La.5/15/01), 788 So.2d 1140, 1149 n. 21. I would disapprove of Kling in favor of the rule pronounced in Estate of Patout v. City of New Iberia, 01-0151 (La.App. 3 Cir. 4/3/02), 813 So.2d 1248, and Lopez v. House of Faith Non-Denomination Ministries, 09-1147 (La.App. 4 Cir. 1/13/10), 29 So.3d 680, and find the continued existence of noxious, unabated chemicals on or beneath a plaintiff's land constitutes a continuing tort, even if the conduct which originally caused the chemical contamination has ceased.

E. Jurisprudence Constante

This Court has applied a version of the continuing tort doctrine for over 125 years. In the case of Werges v. St. Louis, Chicago, and New Orleans R.R. Co., 35 La.Ann. 641 (1883), Justice Poché stated the basic test of a continuing tort: "when the injury is of a continuing nature, the cause of action continues and is renewed de die in diem,[7] as long as the cause of the continuing damage is allowed to continue." Id. at 643, citing C.G. Addison, The Law of Torts, § 1361, p. 1163 (4th Ed. 1876). Five years earlier, the U.S. Supreme Court held, in a case of continuing nuisance by a fertilizer factory, "prescription, whatever the length of time, has no application. Every day's continuance [of the nuisance] is a new offence." Northern Fertilizing Co. v. Hyde Park, 97 U.S. 659, 668-69, 24 L.Ed. 1036 (1878). Moreover, we have applied it in cases of chemical contamination onto immovable property for approximately eighty years. See Young v. International Paper Co., 179 La. 803, 155 So. 231 (La.1934) and Rhodes v. International Paper Co., 174 La. 49, 139 So. 755 (La.1932), discussed above. The doctrine has been applied time and again, and is due great deference as jurisprudence constante.
Once jurisprudence constante has been established, we should be "extremely reluctant to change our position." Borel v. Young, 07-419 (La.7/1/08), 989 So.2d 42, 65. The policy behind this rule is simple, as the public should be able to expect a certain amount of stability and predictability from the decisions of this Court. Id.
Of course, jurisprudence constante is not inviolate. It is a secondary source of law. The primary sources of law are legislation and custom, and of these, legislation is supreme. Civ.Code arts. 1, 3. If the application of the continuing tort doctrine is to be amended, it should be done by legislative act. In In re Medical Review Panel for the Claim of Moses, 00-2643 *1015 (La.5/25/01), 788 So.2d 1173 (Ciaccio, J., pro tem.), we recognized that if the continuing tort doctrine were to be abrogated in medical malpractice claims, it would be done via legislative action.[8]Accord Randazzo v. State, 04-1503 (La.2/18/05), 894 So.2d 337 (Knoll, J., concurring in writ denial). In Randazzo, plaintiff discovered a forceps had been negligently left in his body nine years after surgery. The appellate court held his claim was prescribed, because the legislature had imposed a strict three year prescriptive period, even where the patient had walked around for nine years not knowing that a surgical instrument remained implanted in his abdomen. Randazzo v. State, 03-1470 (La. App. 1 Cir. 5/14/04), 879 So.2d 741, 743-44. Although I was (and still remain) concerned about the harshness of that result, I concurred with the writ denial in recognition of the principle that laws concerning "[s]tatutes of limitation are exclusively a legislative prerogative." Randazzo, 894 So.2d at 337, citing Crier v. Whitecloud, 496 So.2d 305, 310 (La.1986). We should apply that same deference here. If our longheld jurisprudence constante regarding continuing torts is to be overturned, it may only be overturned by the legislature.
This Court should therefore affirm the district court's denial of summary judgment and remand for further proceedings.
NOTES
[1] Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.
[2] Because LDEQ has undertaken remediation, plaintiffs did not seek remediation damages.
[3] LSA-C.C. art. 3492 provides:

Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained. It does not run against minors or interdicts in actions involving permanent disability and brought pursuant to the Louisiana Products Liability Act or state law governing product liability actions in effect at the time of the injury or damage.
LSA-C.C. art. 3493 provides:
When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage.
[4] William Burt's application for supervisory review, which asserted additional grounds for relief, was granted by the court of appeal.
[5] Indeed, as noted by the court in Doe, where the disputed issue is one of law rather than material fact, the use of summary judgment is particularly appropriate for asserting a plea of prescription. Doe, 02-2581 at 4; 857 So.2d at 557 n. 3.
[6] Contrarily, when prescription is raised by the peremptory exception, with evidence introduced at a hearing, the district court's finding of fact on the issue of prescription is subject to the manifest error standard of review. Carter v. Haygood, 04-0646, p. 9 (La.1/19/05), 892 So.2d 1261, 1267.
[7] Defendants additionally attached an excerpt from the deposition testimony of defendant Young, establishing that the leaking underground storage tanks at Burt's Chevron were replaced in 1997, an exhibit relevant to the continuing tort discussion, infra.
[8] Plaintiffs do not contend that they suffer from some disability which might impair their ability to read and understand the LDEQ letters. In fact, defendants attached to their motion interrogatory answers submitted by plaintiffs which indicate that Sandra Hogg can read and write, George Hogg earned a GED, Stephen Hogg earned a high school diploma, David Hogg received a B.A. degree from Louisiana State University, and John Hogg received a B.A. degree from Northeast Louisiana University and an M.A. degree from Louisiana State University.
[9] In Smith v. Our Lady of the Lake Hospital, Inc., 93-2512, p. 28 (La.7/5/94), 639 So.2d 730, 751, we acknowledged that "[s]ummary judgment is seldom appropriate for determinations based on subjective facts, such as motive, intent, good faith, knowledge and malice."
[10] For this reason, the instant case is readily distinguishable from Labbe Service Garage, Inc. supra., the case relied on by the district court to support the ruling denying summary judgment. In Labbe, the date upon which plaintiff acquired knowledge of damage sufficient to commence the running of prescription was put in dispute by plaintiff's affidavit which attested that (1) he was not privy to any soil testing on his property conducted by LDEQ until one year before filing suit; (2) he did not obtain the results of sampling conducted at the request of LDEQ until one year before filing suit; (3) he did not learn the source of the contamination until one year before filing suit; and (4) he did not learn who was responsible for the contamination until one year before filing suit. Unlike the present case, in Labbe there was a dispute as to what plaintiff knew and when he knew it. In this case, there is no similar dispute because plaintiffs' knowledge is contained in the letters and plaintiffs do not dispute the content of the letters or that they received them.
[11] We note, without deciding the issue, that it is questionable whether the tort of trespass even applies in this situation because civil trespass is generally considered to be an intentional tort, requiring proof that the defendant took some intentional action that resulted in harm to the plaintiff. Terre Aux Boeufs Land Co., Inc. v. J.R. Gray Barge Company, 00-2754, pp. 12-13 (La.App. 4 Cir. 11/14/01), 803 So.2d 86, 95, writ denied, 01-3292 (La.3/8/02), 811 So.2d 887. It has been suggested that the action more properly lies in nuisance. 1 DAN B. DOBBS, THE LAW OF TORTS § 53, at 107 (2001) ("Nuisance or negligence rather than trespass is definitely the approach courts take when liquids percolate underground to enter the plaintiff's land beneath the surface.") Because plaintiffs' petition asserts claims arising both in trespass and nuisance, and because the analysis is the same insofar as the issues presented in this case are concerned, it is not necessary to resolve this thorny issue.
[12] Plaintiffs' argument is essentially that trespass is an imprescriptible species of tort, an argument at odds with the plain language of LSA-C.C. art. 3492 and 3493, which makes no exception for trespass (see, Official Revision Comment (b) to LSA-C.C. art. 3492 (1983) noting the one-year prescription applies to all delictual actions), and with the purpose behind prescriptive statutes, which is to prevent stale claims and to require claims to be advanced while the evidence is still fresh. See Giroir v. South Louisiana Medical Center, Division of Hospitals, 475 So.2d 1040, 1045 (La.1985). Plaintiffs' choice of words, borrowed from the jurisprudence, is unfortunate. It is incorrect to label an action imprescriptible simply because the operating cause of the injury is alleged to be continuous. 4 A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE: PREDIAL SERVITUDES § 63 (3d ed.2004). "When the operating cause of the injury is a continuous one, it may be that prescription does not begin to run from the date the injury was first inflicted, but it ought to run at least from the date the damage was completed and the injured party acquired knowledge of it." Id. at 193.
[13] The obligations of neighborhood set forth in LSA-C.C. arts. 667-669 are the source of nuisance actions in Louisiana. Rodrigue v. Copeland, 475 So.2d 1071, 1077-1078 (La. 1985).
[14] Although plaintiffs argue that South Central Bell Telephone, Mouton and LeJeune are distinguishable because those cases were not "trespass cases," the factual allegations in each of the cases are consistent with the traditional definition of a trespassin each instance an unlawful physical invasion of the property of another was alleged. Perrilloux, 2000-2743 at 4, 814 So.2d at 63 (trespass defined as the unlawful physical invasion of the property of another). While the word "trespass" was not invoked, in each case it was argued that the continuing presence of the hazardous foreign substance was a continuous tort; essentially this is the same argument the plaintiffs advance here.
[15] See also, Sadler v. Midboe, 97-2120 (La. App. 1 Cir. 12/28/98), 723 So.2d 1076 (In a suit in which landowner sued for damages for contamination of groundwater and/or subsurface soils as a result of leaking underground storage tanks on neighboring property, prescription held to commence on date leaking tanks were replaced.).
[16] See, note 12, infra.
[17] We specifically reject plaintiffs' argument that the resolution of this case is controlled by Patout, supra. The operating cause of the injury in this case was the leaking underground storage tank. Once the tank was replaced, the tortious conduct ceased, and from that point there was no ongoing wrongful conduct, generating new damages. A continuing trespass is based on recurring tortious conduct, and not on the continuation of harm caused by previous but terminated tortious conduct.

Likewise, Young v. International Paper Co., 179 La. 803, 155 So. 231 (La. 1934), does not support plaintiffs' argument. The facts of that case reveal that the discharge of waste on which plaintiff sued was a continuous one which was still occurring at the time of trial and for which plaintiff sought an injunction to abate the continuing nuisance. Similarly, the facts of Rhodes v. International Paper Co., 174 La. 49, 139 So. 755 (La.1932), indicate that the waste water discharge was continuous.
[18] That the plaintiffs are claiming permanent harm to their property is evidenced in the damages they are seeking. Plaintiffs are not seeking removal costs, but damages for stigma and diminution in the value of the property, damages which are associated with permanent changes in the character of the property.
[1] The majority notes, without deciding, that plaintiffs' claim may sound in nuisance rather than trespass because defendants may have lacked the requisite intent to give rise to a trespass claim. (Opin. at n. 11). As the majority concedes, for the purposes of the continuing tort doctrine there is no meaningful distinction between a trespass claim and a nuisance claim. See, e.g., Young v. International Paper Co., 179 La. 803, 155 So. 231 (1934); Lopez v. House of Faith Non Denomination Ministries, 09-1147 (La.App. 4 Cir. 1/13/10), 29 So.3d 680.
[2] The Third Circuit first found the existence of a continuing tort at 97-1097 (La.App. 3 Cir. 3/06/98), 708 So.2d 526. This Court granted defendant's writ and remanded at 98-0961 (La.07/07/99), 738 So.2d 544. The Third Circuit, applying the law of the case doctrine, again found the continuing tort doctrine applicable at 01-0151 (La.App. 3 Cir. 6/27/01), 791 So.2d 741. This Court again granted a writ and remanded with instructions to reconsider in light of Crump. 01-2211 (La. 12/14/01), 803 So.2d 978. The Third Circuit's final opinion regarding prescription, again in favor of plaintiffs, was rendered at 01-0151 (La.App. 3 Cir. 4/3/02), 813 So.2d 1248. This Court denied writs. 02-1172 (La.6/21/02), 819 So.2d 335.
[3] Interestingly, the fact pattern in Cooper is basically the reverse of Crump. Crump involved a canal that dried up plaintiffs' waterfront property, Cooper involved a dam that flooded plaintiffs' land. In Crump, nothing actually entered onto plaintiff's land, while Cooper involved a "constant interference with [plaintiffs'] servitudes of drainage, causing the permanent flooding of their lands." Cooper, 870 So.2d at 323.
[4] See also Rhodes v. International Paper Co., 174 La. 49, 139 So. 755 (La.1932), another paper mill discharge case. In Rhodes, like Young, this Court held plaintiffs' claim was not prescribed because the waste water remained on the land. However, judgment was rendered for defendant on the rather improbable basis that the "sludge" was "of an alkaline nature, and should have been beneficial rather than deleterious.... The trees, so far as it appears, may have died from another cause." Id. at 55, 139 So. 755. Bleach, for example, is also alkaline in nature, yet few arborists would agree it is "beneficial to plant life" as the Rhodes court seemed to believe.
[5] This is a questionable assumption. Presumably the newly installed telephone cables suffered corrosion from the gasoline, as did the original cables.
[6] See Middelkamp v. Bessemer Irrigating Ditch Co., 46 Colo. 102, 103 P. 280, 284 (Colo. 1909), Hickman v. North Sterling Irrigation Dist., 748 P.2d 1349 (Colo.App. 1987).
[7] Literally, "from day to day." Ballentine's Law Dictionary: Latin Phrases and Maxims, p. 110 (1916).
[8] Although the primary question presented in Moses was "whether the continuing tort doctrine can be invoked to enlarge the prescriptive period under La.Rev.Stat. 9:5628," Id. at 1174, this Court did not resolve that issue because we found there was no continuing tort on the part of Ms. Moses' physician.