GASKINS, J.
l2The plaintiffs in these consolidated cases appeal trial court judgments holding that their claims against the defendants, the Bossier Parish Police Jury, the Office of Bossier Parish Engineer, and Joseph “Butch” Ford, Jr., in his capacity as Bossier Parish Engineer, have prescribed. For the following reasons, we reverse the trial court judgments and remand to the trial court for further proceedings.
FACTS
The plaintiffs in docket number 45,639 are residents of Pecan Grove, a manufactured housing subdivision.[1] The plaintiffs in docket number 45,829 are residents of Shadow Ridge Estates, a housing subdivision.[2] Both subdivisions are located in Bossier Parish close to|aRed Chute Bayou. These cases arise from the enactment by the Bossier Parish Police Jury of an ordinance which became effective on September 3, 2008, adopting recommendations by the Federal Emergency Management Agency (“FEMA”) and placing portions of the plaintiffs’ property in the floodway of Red Chute Bayou rather than in the flood zone as they were previously classified. In a flood zone, the foundations of buildings must be placed a certain distance above the base flood elevation. However, because the property is now classified as being in the floodway, encroachments are prohibited, including fill, new construction, substantial improvements, and other devel *278 opments unless the owners obtain a costly “No Rise” certifícate from the parish stating that the proposed work on the property will not result in any increase in the flood levels within the community during the occurrence of the base flood discharge. The plaintiffs in both suits filed their claims in the trial court on August 28, 2009, within one year of the passage of the Bossier Parish ordinance, alleging that they did not receive proper notice of the change in classification affecting their property and that they have suffered damages as a result of the reclassification of their property.
The Pecan Grove plaintiffs’ suit was filed individually and on behalf of a class of similarly situated persons. They alleged that Bossier ^Parish commissioned a study in 2000 by the engineering firm of Owen & White, Inc. to comply with a FEMA request for redrawing or remapping of flood zones and floodways, in order to meet FEMA regulations regarding the purchase by landowners of flood insurance through the National Flood Insurance Program (“NFIP”). In March 2004, FEMA gave the Flood Insurance Study (“FIS”) and the Flood Insurance Rate Map (“FIRM”) to the Bossier Parish engineer. In May 2004, the parish engineer presented the documents to the Bossier Parish Police Jury. Revised copies of the FIS and FIRM were provided by FEMA to the Bossier Parish Police Jury in March 2006.
FEMA placed notices of the proposed changes in the base flood elevation affecting areas including Red Chute Bayou in the Bossier Press Tribune on April 28, 2006, and May 5, 2006. FEMA provided information to the Bossier Parish Police Jury that a 90-day appeal period was in effect after the second publication in which any owner or lessee of property in the community who believed his or her property rights would be adversely affected by the base flood elevation determinations could appeal to the Bossier Parish Police Jury. No appeals were taken.
As required by federal regulations in order to qualify for flood insurance, the Bossier Parish Police Jury enacted ordinance number 4241(A) which became effective on September 3, 2008, adopting the FIS |5and FIRM submitted by FEMA. The effect of the ordinance was to place the Pecan Grove and Shadow Ridge Estates in the floodway instead of the flood zone. The Pecan Grove plaintiffs filed suit on August 28, 2009, claiming that they were deprived of their due process rights because they were not given proper notice of the FIS or FIRM and were not informed of the 90-day period to appeal the adoption of the FIRM in 2006. They sought damages for the taking of their property without just compensation, diminution in value of the property, increase in the cost of flood insurance, if available, expenses of moving manufactured homes, loss of the value of improvements, loss of mortgage loans, increase in interest rates, loss of insurable value of property, loss of use and/or enjoyment of property and general damages including mental and emotional distress, embarrassment and humiliation.
The Shadow Ridge plaintiffs also filed suit on August 28, 2009, for damages and for certification as a class action, essentially pleading the same facts as the Pecan Grove plaintiffs. Additionally, they alleged that in July 1998, James Bruce Wag-goner and Colleen Waggoner bought a lot in Shadow Ridge, built a house, and have lived there since that time. In October 2004, the Waggoners purchased additional lots with the intention | fiof developing the subdivision. Beforehand, in May 2004, Mr. Waggoner inquired of the parish engineer, Mr. Ford, regarding the requirements for developing the lots. He was not *279 given any information about the new FIS report, the proposed FIRM, or the changes that would occur with the adoption of the FIRM. Mr. Waggoner began selling lots in December 2004. Permits were issued and new construction and improvements were made until the adoption of the ordinance which became effective September 3, 2008.
The Shadow Ridge plaintiffs claimed that the FEMA announcement published in the Bossier Press Tribune did not provide notice of the change in the status of the property being placed in the floodway. They alleged that after the passage of the ordinance, it had been shown that some or all of Shadow Ridge is above the base flood elevation for the 100-year flood and should not have been included in the floodway.
The Shadow Ridge plaintiffs also alleged that they were deprived of their due process rights under the United States and Louisiana constitutions in that they did not receive due process and proper notification of the proposed change in the status of the property and they did not have the proper opportunities to appeal the proposed change. 17Further, they claimed that the defendants negligently failed to determine whether Shadow Ridge and/or any and all parts thereof should actually be placed in the floodway by failing to make a proper investigation by survey, field study, or other means. They sought damages for the taking of their property without just compensation, diminution in value of the property, increase in the cost of flood insurance, if available, loss of mortgage loans, increase in interest rates, loss of insurable value of property, loss of use and/or enjoyment of property and general damages including mental and emotional distress, embarrassment and humiliation.
In both cases, the defendants filed exceptions of prescription and no cause of action.[3] They claimed that notice of the proposed flood maps and the 90-day appeal period was published in the Bossier Press Tribune on April 28, 2006 and May 5, 2006, and that these publications provided notice that the base flood elevations around Red Chute Bayou may be modified and designated a flood zone. According to the defendants, the one-year prescriptive period for filing these tort suits began to run on May 5, 2006, after the publication of the second notice by FEMA. These suits were filed on August 28, 2009; the defendants claim they are barred by prescription.
lsThe plaintiffs in both suits argued that notice of the changes in classification of their property was received on September 3, 2008, when the Bossier Parish Police Jury passed the ordinance adopting the FIRM. They claimed that the publication of the notices in the Bossier Press Tribune did not give them actual or constructive notice of the change in the classification of their property to a floodway.
The Pecan Grove case was assigned to a judge of the Twenty-Sixth Judicial District Court. The exceptions were submitted on briefs. On February 4, 2010, the trial court issued a judgment granting the exception of prescription and dismissing the claims of the Pecan Grove plaintiffs. In written reasons for judgment, the trial court stated that constructive notice was received by the plaintiffs on the date of the second publication by FEMA in the Bossier Press Tribune and that the appeal process began to run after that. The court *280 found that the matter had prescribed; the exception of prescription filed on behalf of the defendants was granted. Because the trial court granted the exception of prescription, it found that there was no need to address the exception of no cause of action.
The Shadow Ridge case was assigned to a different judge of the Twenty-Sixth Judicial District Court. A hearing on the exceptions of prescription and no cause of action was heard in that matter on February |922, 2010. The defendants argued that the FEMA notice in the Bossier Press Tribune referenced the base flood elevation around Red Chute Bayou and said that the areas might be redesignated as a flood zone. The defendants urged that there was no requirement that the property owners be given individual notice. They maintained that the plaintiffs received constructive notice on May 5, 2006, the date of publication of the second FEMA notice, and that the one-year prescriptive period began to run from that date.
The plaintiffs asserted that the FEMA notice in the newspaper concerned insurance rights and not the loss of legal rights. They pointed out that there was no mention of the propei'ty being placed in the floodway in the notices. The notice spoke only of the flood zones and base flood elevations. They contended that they did not have a right to sue until the passage of the ordinance by Bossier Parish Police Jury adopting the FEMA recommendations.
The plaintiffs further argued that the doctrine of contra non valentem applied and negated any kind of constructive notice. They cited the conversation that Mr. Waggoner had with Mr. Ford after the FEMA maps were under consideration by the parish, but before the ordinance was passed. At that time, no mention was made of the fact that Shadow |inRidge would be designated in the floodway. The plaintiffs maintained that they could not have known that their property was affected until after the passage of the ordinance.
At the hearing on the Shadow Ridge exceptions of prescription and no cause of action, a discussion was held about procedures used in passing the new Bossier Parish ordinance adopting the FEMA recommendations. It appears that a public hearing was held on August 20, 2008, to consider adoption of the ordinance incorporating the changes regarding the new FEMA flood maps for Bossier Parish. The ordinance adopting the FEMA regulations was passed and became effective on September 3, 2008.
On March 23, 2010, the trial court in the Shadow Ridge case signed a judgment granting the defendants’ exception of prescription. The trial court’s reasons for judgment are essentially identical to those handed down by the trial court in the Pecan Grove case. The plaintiffs in both cases appealed. On August 5, 2010, this court granted a motion to consolidate the two cases on appeal.
On appeal, the plaintiffs argue that the trial court erred in granting the exceptions of prescription. They contend that the trial court erroneously found that the prescriptive period began to run from the Insecond notice contained in the FEMA publication rather than from the date the Bossier Parish ordinance took effect. The plaintiffs urge that the FEMA publication did not serve as adequate notice of a re-designation of their property being in a floodway. The plaintiffs also contend that a taking of their property occurred by virtue of the change in the classification of their land, and therefore, the prescriptive period of three years under La. R.S. 13:5111 is applicable. The plaintiffs maintain that the doctrines of contra non va- *281 lentern and continuing tort apply in this matter to stop the running of prescription.
POINT AT WHICH PRESCRIPTION COMMENCED TO RUN
The plaintiffs argue that the trial court erred in concluding that the FEMA newspaper publication provided constructive notice of a change in the classification of their property and that the plaintiffs’ actions against the defendants prescribed in May 2007, one year after the publication of the last FEMA notice on May 5, 2006. They claim that floodway status was never mentioned in the publications and that the notice does not set forth in adequate detail the parts of Bossier Parish affected by the proposed changes sufficient to put the plaintiffs on notice that their property was included.
| ii>The plaintiffs argue that their damages arose from the Bossier Parish Police Jury’s action in passing and enforcing the Floodway Damage Prevention Ordinance number 4241, which became effective on September 3, 2008, finalizing the classification of their property as being in the flood-way. The plaintiffs urge that the effective date of the ordinance was the point at which the owners of the property became aware of and should have known of the potential claims. According to the plaintiffs, they are not complaining of any action taken by FEMA, but rather they complain of the actions taken by the Bossier Parish Police Jury in enacting ordinance number 4241 and designating their property as being in a floodway.
Legal Principles
La. C.C. art. 3492 provides that delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained. When damage is caused to immovable property, the one-year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage. La. C.C. art. 3493. The commencement of prescription under this article is triggered by actual or constructive 11Rknowledge of damage. Hogg v. Chevron USA, Inc., 2009-2632 (La.7/6/10), 45 So.3d 991.
Constructive knowledge has been defined as whatever notice is enough to excite attention and put the injured party on guard or call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry might lead, and such information or knowledge as ought to reasonably put the injured party on inquiry is sufficient to start the running of prescription. In assessing whether an injured party possessed constructive knowledge sufficient to commence the running of prescription, the court’s ultimate consideration is the reasonableness of the injured party’s action or inaction in light of the surrounding circumstances. Hogg v. Chevron USA, Inc., supra.
While prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong, and should not be used to force a person who believes he may have been damaged in some way to rush to file suit, a plaintiff is responsible to seek out those whom he believes may be responsible for a specific injury. In a case involving constructive knowledge, the time when prescription begins to run depends on the reasonableness of a plaintiffs action or inaction. Hogg v. Chevron USA, Inc., supra.
| i4Ordinarily, the party pleading the exception of prescription bears the burden of proving the claim has prescribed. However, when the face of the petition reveals that the plaintiffs claim has prescribed, *282 the burden shifts to the plaintiff to show why the claim has not prescribed. Hogg v. Chevron USA, Inc., supra.
Discussion
The evolution of the federal scheme for protecting landowners in flood-prone areas is outlined in Till v. Unifirst Federal Savings and Loan Association, 653 F.2d 152 (5th Cir.1981). The court in Till stated:
From 1968 to 1977, Congress passed a number of enactments which compose the National Flood Insurance Program (the “Program”). The first enactment, the National Flood Insurance Act of 1968, created a nationwide program to make flood insurance available to property owners in flood prone areas and to encourage the adoption by local communities of sound land use policies designed to diminish damage from flooding.... The procedures created by the 1968 Act were voluntary in nature. Congress anticipated that the local communities would voluntarily adopt the land use restrictions necessary for its citizens to participate in the flood insurance plan. However, it became clear that local acceptance of the voluntary program was inadequate. Accordingly, Congress enacted the Flood Disaster Protection Act of 1973 which amended the Program to essentially make its adoption by the local governing bodies mandatory.
liSThe 1973 Act used severe sanctions against non-participating communities to encourage enrollment in the Program. Any community not participating by July 1, 1975 would receive neither federal financial assistance for acquisition or construction purposes nor federally related financing by private lending institutions for use in HUD designated flood risk zones. Participation was conditioned upon adoption by the local community of the HUD promulgated guidelines for land use. Thus, a community not adopting the land use controls and participating in the Program was virtually cut off from federal assistance. [Footnotes omitted.]
The National Flood Insurance Act of 1968 was enacted to provide previously unavailable flood insurance protection to property owners in flood-prone areas. Under the program that effectuated this act, NFIP, flood insurance cannot be sold or renewed within a community unless the community has adopted adequate flood plain management regulations consistent with federal criteria. 44 C.F.R. § 60.1(a). The NFIP is administered by FEMA. When the federal government has provided data regarding the regulatory floodway to the community, the community is required to select and adopt the regulatory floodway based upon the principle that the area chosen for the floodway must be designed to carry the waters of the base flood, without increasing the water surface elevation of that flood more than one foot at any point. The community is also required to prohibit encroachments, including fill, new construction, | ^substantial improvements and other development within the adopted regulatory floodway unless it has been demonstrated through hydrologic and hydraulic analyses performed in accordance with standard engineering practice that the proposed encroachment would not result in any increase in flood levels within the community during the occurrence of the base flood discharge. 44 C.F.R. § 60.3.
The authority under Louisiana law to allow parishes and municipalities to comply with the federal regulations is found in La. R.S. 38:84, which provides in pertinent part:
A. In order to secure for the citizens of the state of Louisiana the flood insurance coverage provided for by the Na *283 tional Flood Insurance Act of 1968, 42 USC 4001 et seq., all of the parishes and municipalities of the state may adopt such ordinances, rules, and regulations, including zoning and land use regulations, as are necessary to comply with the requirements of said Act and the regulations adopted pursuant thereto by the Federal Emergency Management Agency.
Flood elevation determinations and the FEMA notice provided in this case are governed by 42 U.S.C. § 4104, which states in pertinent part:
(b)Publication of flood elevation determinations; appeal of owner or lessee to local government; scientific or technical knowledge or information as basis for appeal; modification of proposed determinations
| i7The Director shall publish notification of flood elevation determinations in a prominent local newspaper at least twice during the ten-day period following notification to the local government. During the ninety-day period following the second publication, any owner or lessee of real property within the community who believes his property rights to be adversely affected by the Director’s proposed determination may appeal such determination to the local government. The sole basis for such appeal shall be the possession of knowledge or information indicating that the elevations being proposed by the Director with respect to an identified area having special flood hazards are scientifically or technically incorrect, and the sole relief which shall be granted under the authority of this section in the event that such appeal is sustained in accordance with subsection (e) or (f) of this section is a modification of the Director’s proposed determination accordingly.
(c) Appeals by private persons; submission of negativing or contradicting data to community; opinion of community respecting justification for appeal by community; transmission of individual appeals to Director; filing of community action with Director
Appeals by private persons shall be made to the chief executive officer of the community, or to such agency as he shall publicly designate, and shall set forth the data that tend to negate or contradict the Director’s finding in such form as the chief executive officer may specify. The community shall review and consolidate all such appeals and issue a written opinion stating whether the evidence presented is sufficient to justify an appeal on behalf of such persons by the community in its own name. Whether or not the community decides to appeal the Director’s determination, copies of individual appeals shall be | i8sent to the Director as they are received by the community, and the community’s appeal or a copy of its decision not to appeal shall be filed with the Director not later than ninety days after the date of the second newspaper publication of the Director’s notification.
(d) Administrative review of appeals by private persons; modification of proposed determinations; decision of Director: form and distribution
In the event the Director does not receive an appeal from the community within the ninety days provided, he shall consolidate and review on their own merits, in accordance with the procedures set forth in subsection (e) of this section, the appeals filed within the community by private persons and shall make such modifications of his proposed determinations as may be appropriate, taking into account the written opinion, if any, issued by the community in not supporting such appeals. The Director’s *284 decision shall be in written form, and copies thereof shall be sent both to the chief executive officer of the community and to each individual appellant.
(e) Administrative review of appeals by community; agencies for resolution of conflicting data; availability of flood insurance pending such resolution; time for determination of Director; community adoption of local land use and control measures within reasonable time of final determination; public inspection and admissibility in evidence of reports and other administrative information Upon appeal by any community, as provided by this section, the Director shall review and take fully into account any technical or scientific data submitted by the community that tend to negate or contradict the information upon which his proposed determination is |19based. The Director shall resolve such appeal by consultation with officials of the local government involved, by administrative hearing, or by submission of the conflicting data to an independent scientific body or appropriate Federal agency for advice. Until the conflict in data is resolved, and the Director makes a final determination on the basis of his findings in the Federal Register, and so notifies the governing body of the community, flood insurance previously available within the community shall continue to be available, and no person shall be denied the right to purchase such insurance at chargeable rates. The Director shall make his determination within a reasonable time. The community shall be given a reasonable time after the Director’s final determination in which to adopt local land use and control measures consistent with the Director’s determination. The reports and other information used by the Director in making his final determination shall be made available for public inspection and shall be admissible in a court of law in the event the community seeks judicial review as provided by this section.
[[Image here]]
(g) Judicial review of final administrative determinations; venue; time for appeal; scope of review; good cause for stay of final determinations
Any appellant aggrieved by any final determination of the Director upon administrative appeal, as provided by this section, may appeal such determination to the United States district court for the district within which the community is located not more than sixty days after receipt of notice of such determination. The scope of review by the court shall be as provided by chapter 7 of Title 5. During the pendency of any such litigation, all final determinations of the Director shall |2nbe effective for the purposes of this chapter unless stayed by the court for good cause shown.
The FEMA notifications in the present case, which were required by the federal statutory scheme outlined above, appeared in the public notice section of the Bossier Press Tribune on April 28, 2006, and May 5, 2006. The notices provided in pertinent part:
DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency
Proposed Base Flood Elevation Determinations for Bossier Parish, Louisiana and Incorporated Areas
AGENCY:
Federal Emergency Management Agency
ACTION:
Proposed Rule
*285 SUMMARY: Technical information or comments are solicited on the proposed modified Base (1-percent annual chance) Flood Elevations (BFEs) shown in the preliminary Flood Insurance Studies (FISs) and Flood Insurance Rate Maps (FIRMs) for the communities listed in the table below. The BFEs are the basis for the floodplain management measures that each community is required to either adopt or show evidence of being already in effect in order to qualify or remain qualified for participation in the National Flood Insurance Program.
DATES: The period for comment will be ninety (90) days following the second publication of these proposed rules in a newspaper of local circulation.
ADDRESSES: (See Table Below)
SUPPLEMENTARY INFORMATION: The Federal Emergency Management Agency (FEMA) gives notice of the proposed determinations of BFEs, in accordance with Section 110 of the Flood Disaster Protection Act of 1973 (pub. L.93-234), 87 Stat. 980, which added Section 1363 to the National Flood Insurance Act of 1968 (Title XIII of the Housing and Urban Development Act of 1968) (Pub.L.90-448-), 42 U.S.C. 4001-4128, and 44 CFR 67.4(a)
| ztThese elevations, together with the floodplain management measures required by Section 61.3 of the program regulations, are the minimum that are required. They should not be construed to mean the community must change any existing ordinances that are more stringent in their floodplain management requirements. The community may at any time enact stricter requirements on its own, or pursuant to policies established by other Federal, State, or regional entities. These proposed modified elevations will also be used to calculate the appropriate flood insurance premium rates for the new buildings and their contents and for the second layer of insurance on existing buildings and their contents.
Pursuant to the provisions of 5 USC 605(b), the Administrator, to whom authority has been delegated by the director, FEMA, hereby certifies that the proposed modified BFE determinations, if promulgated, will not have a significant economic impact on a substantial number of small entities. A BFE determination under Section 1363 forms the basis for new local ordinances which, if adopted by a local community, will govern future construction within the floodplain area. The elevation determinations, however, impose no restriction unless and until the local community voluntarily adopts floodplain ordinances in ■ record with these elevations. Even if ordinances are adopted in compliance with Federal standards, the elevations prescribe how high to build in the floodplain and do not prohibit development. Thus, this action only forms the basis for future local actions. It imposes no new requirement; of itself it has no economic impact.
Lessees and owners of real property in the following communities are encouraged to review the preliminary FISs and FIRMs and to submit comments to the appropriate community representatives as listed below. Proposed BFEs along flood sources studied in detail are shown on the flood profiles in the study. The proposed modified BFEs are as follows:

Source of Elevation in feet (NAVD) Communities

Flooding and Existing/Modified

Location of Referenced

Elevation Affected

*286 Red Chute BayouNone *154 City of Bossier City
|^Approximately 12,400 Bossier Parish upstream of Smith Road (Unincorporated Areas)
Approximately 4,050 *165 *169 upstream of Dogwood Trail
North American Vertical Datum of 1968
ADDRESSES:
CITY OF BOSSIER CITY
Maps are available for inspection at City Hall, 620 Benton Road, Bossier City, Louisiana 71111
Send Comments to The Honorable Lorenz “Lo” Walker, Mayor, City of Bossier City, City Hall, 620 Benton Road, Bossier City, Louisiana 71111
BOSSIER PARISH (UNINCORPORATED AREAS)
Maps are available for inspection at the Police Jury Office, 204 Burt Boulevard, Room 108, Benton, Louisiana 71006.
Send comments to William R. Altimus, Bossier Parish Administrator, P.O. Box 70, 204 Burt Boulevard, Room 108, Benton, Louisiana 71006.
| gjApril 28, 2006 & May 5, 2006 Bossier Press Tribune[4]
After FEMA fulfilled its requirements, the Bossier Parish Police Jury enacted the required ordinance under the authority of La. R.S. 38:84 to adopt the FEMA recommendation concerning flood hazards in Bossier Parish. In examining the record before us, we conclude that the FEMA advertisements, while in compliance with federal law, were not sufficient to provide constructive or actual notice of the proposed changes in the flood classification of the property at issue here in order to commence the running of prescription on the plaintiffs’ claims. As can be seen from the notices, they inform the public of changes in base flood elevations along various bodies of water in Bossier Parish, including Red Chute Bayou. However, there is no listing of the subdivisions involved. Further, nowhere in the notice is there any mention of a change in the classification of the property from flood zone to floodway. The notice specifies that the elevation determinations impose no restriction unless and until the local community adopts flood plain ordinances according to the elevations. The notice states that, “the elevations prescribe how high to build in the floodplain and do not prohibit development. Thus, this Inaction only forms the basis for future local actions. It imposes no new requirement of itself and has no economic impact.”
Although the Bossier Parish Police Jury complied with the federal requirements for eligibility for federally-backed flood insurance, there is nothing in the FEMA publications to inform property owners that the adoption of the new FIS or FIRM would result in a designation of their land as being in the floodway, with the attendant increase in restrictions and prohibitions regarding the use and development of the property. The publication itself states that the elevation determinations are not effective until adopted by a local community ordinance.
It was not the publication of the second FEMA notice on May 5, 2006, that started the running of the one-year prescriptive period found in La. C.C. art. 3492, but rather the passage of the Bossier Parish Police Jury ordinance imposing the federal recommendations on the local community. This event changed the status of the plaintiffs’ land and made its development more burdensome, if not impossible. The plain *287 tiffs’ claims opposing the reclassification of their property have not prescribed. The trial courts below erred in finding otherwise.
APPLICABLE PRESCRIPTIVE PERIOD FOR A “TAKING”
| gsWhile a portion of the plaintiffs’ claims sound in tort, they also asserted a cause of action for taking of their property. They claim that actions for the taking of their property would not have prescribed until three years after the discovery of the taking, pursuant to La. R.S. 13:5111.[5] The plaintiffs claim that the taking resulted from the passage of the ordinance adopting the zoning changes which placed the plaintiffs’ property in the floodway. The changes affected the value, use, and restrictions placed on the plaintiffs’ property. The changes caused the plaintiffs to incur increased costs and financial burdens as a result of the classification of their property as being in the floodway.
Legal Principles
The three-year prescriptive period of La. R.S. 13:5111 begins to run from the date of discovery of the taking. Unlimited Horizons, L.L.C. v. Parish of East Baton Rouge, 1999-0889 (La.App. 1st Cir.5/12/00), 761 So.2d 753. In order to determine whether property rights have been “taken” under La. Const. Art. 1 § 4, which provides that property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner, the [ 2f,court must determine (1) if a property right has been affected; (2) whether the property has been taken or damaged in a constitutional sense; and (3) whether the taking is for a public purpose under Article 1, § 4. Adams v. Caddo Parish, 43,047 (La.App.2d Cir.3/19/08), 978 So.2d 1202.
Discussion
In support of their argument that the Bossier Parish Police Jury ordinance re-designating their property as being in a floodway constitutes a taking of the property, the plaintiffs cite La. Att. Gen. Op. 09-0274.[6] That opinion dealt with whether compensation must be paid by the government to a landowner when an amendment to a city ordinance ultimately results in a regulatory taking of private property. According to the opinion, a regulatory taking *288 occurs when governmental regulations compel a property owner to suffer a physical invasion of property or denies the owner of all economically beneficial or productive use of the land. A regulatory taking may also occur if there has been a substantial diminution in value to such an extent that there has been a destruction of a major portion of the property’s value. The City of Zachary enacted an ordinance substantially similar to that enacted by the Bossier Parish ^Police Jury in this case, adopting and incorporating the FIS formulated by FEMA for East Baton Rouge Parish. The opinion stated:
The tract at issue was rendered partially useless when the property was placed in a “floodway.” Being designated as a floodway means that the owner of the Property bears the burden of proof in showing that any construction conducted on the property will not increase flooding in the area. This burden of proof is nearly impossible, and its existence automatically reduces the value of the Property. The primary issue involved here is whether or not this particular reduction of property value amounts to a “regulatory taking,” which requires the payment of just compensation under both the United States and Louisiana Constitutions.
The opinion outlined two types of regulatory actions that can be characterized as a “taking” without undergoing a thorough factual analysis; first, regulations that compel the property owner to suffer a physical “invasion” of his property and second, regulations that deny an owner all economically beneficial or productive use of the land, citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), and Layne v. City of Mandeville, 93-0046 (La.App. 1st Cir.12/29/93), 633 So.2d 608, writ denied, 94-0268 (La.3/25/94), 635 So.2d 234.
The opinion noted that a landowner may recover for inverse condemnation if he proves in court that a regulatory taking has denied 12shim of “all economically beneficial or productive use of his land.” An unconstitutional taking of property does not result merely because the owner is unable to develop it to its maximum economic potential.
Whether a taking occurred in the case sub judice is not currently before us because the merits of the claim have not been considered by the trial court. The plaintiffs have clearly alleged a “taking” in their pleadings and the three-year prescriptive period of La. R.S. 13:5111 is applicable for those claims. As outlined above, the event that triggered the running of prescription in this matter was the passage of the ordinance by the Bossier Parish Police Jury placing the plaintiffs’ property in a floodway. This ordinance became effective on September 3, 2008. The plaintiffs’ suit filed on August 28, 2009, was timely.
CONTRA NON VALENTEM AND CONTINUING TORT
The plaintiffs maintain that the actions and misrepresentations by the defendants preclude a finding of prescription pursuant to the doctrine of contra non valentem. The plaintiffs also argue that, pursuant to the continuing tort doctrine, their actions are not prescribed. Because we find that the plaintiffs’ claims are not barred by prescription, we pretermit consideration of these arguments.
CONCLUSION
| MFor the reasons stated above, we find that the plaintiffs’ claims in this matter have not prescribed. We reverse the judgments of the trial court granting the exceptions of prescription. The matter is remanded to the trial court for further *289 proceedings. Costs in this court are assessed to the Bossier Parish Police Jury in the amount of $293.00.
REVERSED; REMANDED FOR FURTHER PROCEEDINGS.

. The plaintiffs in 45,639-CA are: Sharon Anderson, Carl Anderson, Michael Beran, Bonnie Beran, Jamie Duane Douglas, Tiffany H. Douglas, Jared Eguards, Tonya Eguards, Bryan Harrer, Marci Harrer, Michael Robert Josey, Jennifer Josey, Phillip Reed, Ashley Reed, and Charles M. Scott.

. The plaintiffs in 45,829-CA are: James Bruce Waggoner, Colleen Waggoner, Purple Plum Properties, LLC, Becky Alexander, Charles Alexander, David Alexander, Jeffrey Kilmer Blackwell, Ted Bogues, Jennifer Bo-gues, Deana Rae Cline, Donnie Cole, Shirley Cole, Beverly Coleman, David Kyle Coleman, William Davis, Sheila Davis, Stacey Durbin, Sandy Durbin, Robert Eder, Diana Eder, Darren Fazio, Dana Fazio, Theodore Galewski, Linda Galewski, Bobby G. Gill, Jennifer Gill, Lynda Harper, Charles Patrick Harper, Robert W. Jones, Gina L. Jones, Joseph Victor Kopke, Brittany Nicole Kopke, Karen Lee, Oscar Wayne Lee, Kelly Lococo, Eric Lococo, Mark Wayne Mammarelli, Debora Mammar-elli, Brett McCall, Brittni McCall, Mittie Blackshire McCray, Ernest Robert Negrete, Judy Walker Negrete, Betty Jane Brewer H. Owens, Leslee Rains, Kristen Rains, Vernon E. Sampley, Wilford Steffon Smith, Erica Smith, Roger Suiter, Deborah Suiter, Brian Teutsch, Lora Teutsch, Dalbert Mitchell Wiggins, Amelda Wiggins, and Matthew Joel Wood.

. Owen & White, Inc., originally named as a defendant, was dismissed by the plaintiffs in both suits, due to the fact that the survey in these matters was completed in 2001, and any claims against the company were barred by the five-year prescriptive period in La. R.S. 9:2772.

. The notices contained numerous typographical errors. Where possible, we have corrected the text to make the notices comprehensible. It should be noted that the notices were printed in exceptionally small type.

. La. R.S. 13:5111 provides:
A. A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding. Any settlement of such claim, not reduced to judgment, shall include such reasonable attorney, engineering, and appraisal fees as are actually incurred because of such proceeding. Actions for compensation for property taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking.
B. The rights of the landowner herein fixed are in addition to any other rights he may have under the constitution of Louisiana and existing statutes, and nothing in this Part shall impair any constitutional or statutory rights belonging to any person on September 12, 1975.

. Although Louisiana Attorney General opinions are merely advisory and not binding, the courts of this State have recognized their persuasive authority. See Holley v. Plum Creek Timber Co. Inc., 38,716 (La.App.2d Cir.6/23/04), 877 So.2d 284, and cases cited therein.