DREW, J.
| defendants, Patrick and Annette Matthews and Louisiana Farm Bureau Casualty Insurance Company, filed this writ application seeking review of the denial of their exception of prescription. This court granted a writ of certiorari, and we now reverse the judgment of the trial court, sustain the defendants’ exception of pre *503 scription, and dismiss the plaintiffs’ lawsuit against the defendants.
Plaintiffs, Glen and Delia Blevins, own a piece of property in Webster Parish; Patrick and Annette Matthews own a tract immediately west of and contiguous to the Blevins property. A saltwater pipeline operated by The Long Trusts runs through the Matthews property near its border with the Blevins property.
On June 10, 2011, Patrick Matthews was operating a bulldozer on the Matthews property when he damaged the pipeline, later causing a saltwater spill. The Blev-inses were not aware of the incident immediately; at the time, Mr. Blevins was recovering from knee surgery that he underwent on May 31, 2011. The pipeline was repaired and the damage on Mr. Matthews’ property was remediated thereafter.
In his deposition, Mr. Blevins described when he first became aware of unusual activity near his property. He said that he came home from the hospital on June 5, 2011, and his wife went over to the affected area and learned that workers were clearing off the fence row. One of his neighbors told him that in the following days, the workers used a machine to pull several trees out of the ground. While Mr. Blevins was at home during his recovery, he could see workers hauling out “a lot of dirt” in big trucks from lathe Matthews property. However, he waán’t able to visit the site of the work for some time. He explained:
It was seven weeks after the surgery and I was able to get in a truck and get the seat back far enough. I had my right foot on the gas and my left foot on the brake and I went across the road and asked the guy that was working over there at the other tank what had happened down there. He told me that they had a salt water leak and that they had been cleaning it up.
Mr. Blevins drove to the site and saw'that the workmen had dug a hole on the Matthews property that abutted the Blevins property; he said that the hole revealed several feet of the survey stake that marked the boundary between his property and the Matthews property. Although the digging had required the removal of the fence between the properties, Blevins said, “As far as I knew, they had cleaned up his side and that I probably didn’t have no damage because no one told me anything about it.” Nevertheless, Blevins said:
Outside of that they had took [sic] all the big trees out down the fence row. The big trees was four foot, forty inches, four foot in diameter. The trees is actually on my side, but the water [sic] was embedded in some of them.... I think they took out somewhere between eight and ten- Those were on my property. Actually one tree was five foot over on my property. It was really a large tree.
He later explained that he believed that Matthews and L.B. Walker Logging Company, Inc., had taken out 10 or so trees prior to the spill and sold them, and he believed that the damage to the pipeline was caused while digging for dirt to fill in the holes from which the trees had been removed. Matthews denied removing any large trees prior to the spill.
When asked what other damage he suspected that he had other than the missing trees, Blevins said, “Well, there was two big trees that was ladying at the time. They were real large trees.” He also explained that his property was downhill from the Matthews property and said:
Q: Did you think — did you suspicion [sic] that when you found out that *504 there had been a spill it had to have come over on your side?
A: I had suspicion that it looked that way to me.
Matthews said that sometime after the spill, in the summer of 2011, he spoke with Mr. Blevins during the cleanup of the property. Matthews said that Blevins told him that he “didn’t understand how salt water could have been on mine and not on his property” and expressed concern about damage to his (Blevins’) property.
Mr. Dossie Dews, an employee of The Long Trusts who worked on the pipeline, said that he spoke with Mr. Blevins “probably weeks” after the spill, and that Blevins told him “that water had seeped off of this property here which was not his and had seeped over on his.” Dews said that in “early fall” of 2011, he had a conversation with Mr. Blevins about Blevins’ dying trees.
The record includes a report from the Department of Environmental Quality (“DEQ”) dated September 12, 2011, stating that Glenn Blevins had reported to DEQ that, “Land owner recently found out property next to his had saltwater pipe burst and spill saltwater.”
The record further shows that Mr. Blevins contacted the Office of Conservation on September 13, 2011. Blevins explained that he was concerned about his dying trees. 'An employee with that office, Mr. H. Steve Fomby, came to the Blevins property the next day.
LFomby’s September 14, 2011, report of that meeting reflects that Mr. Blevins complained to him “that a SW spill that occurred near his property line on June 10, 2011, had migrated onto his property killing two large oak trees.” Fomby told Blevins of Fomby’s conversation with Dos-sie Dews, who in turn had spoken with an employee of DEQ, Agent Phillip Marsalis. Dews told Fomby (and Fomby told Blevins) that Marsalis said that “due to the drought conditions that we were in at this time it might be next spring before we know whether it was SW or the drought that killed the trees.”
Mr. Blevins stated:
And I got the quality [DEQ] man there who told me, he said, “Well, Glen,” he said, “they [the trees] might come back in the spring” because it was late in the fall when we were talking, and he said and the big tree was really a nice tree. I mean, you are talking about an 80-year-old tree. And he said, “I think we ought to wait until spring and see if the trees leaf back out and everything will be okay.” I said, I agree with you.
However, Blevins also said:
I recall that the guy down in Shreveport when I called him and told him that I had some trees die, two trees die and that they had told me there is a salt water spill on the other side of my fence which the fence wasn’t there then they had built a new fence. And he said, “Well, it’s been hot weather” and things. He said “They could have died from drought.” I said, well, no, all the other trees is real healthy. I said, I don’t think they are dying from drought. I said, I think there is some contamination got over there. So that was that guy trying to feather out of it somehow.... I thought there was some something or another they were dying. It wasn’t because of the drought.... I had an idea something else is causing them to die. What for sure I don’t know.
At his second deposition, Blevins said that he initially accepted the drought theory advanced by Mr. Fomby.
IfiAfter this meeting, Mr. Blevins took soil samples from his property to have them analyzed. The record includes the *505 reports from the LSU Ag Center relating to these samples; the reports state that the “date received” was October 3, 2011, and Mr. Blevins said that he took the samples a day or two before that. Regarding these first samples, Blevins related:
Seven weeks after the accident. It was probably — I don’t know if I have got that part wrote down or not. It was sometime after that I had walked — got over there and checked it, so let’s see May 31st — probably in June something because I was curious, you know, that I might — since they cleaned, right down by my survey stake I couldn’t understand why that they could be so close to my survey stake and not have no contamination, you know. I could see three foot in my survey stake. It went six foot right down beside of it.
(Emphasis added.) Blevins admitted that he knew that there had been a saltwater spill before he took the samples. He said, “About a month later, I got the samples back and that was when I started calling the quality [DEQ] people and I told them I suspected maybe I had some damage.” Blevins • explained the results of the tests on these samples:
The two samples over in the area that— where the water ran short, not a real high level, but three times more than it would take to kill a tree.
In December 2011, DEQ conducted soil testing on the Blevins property. The agency’s tests showed significant saltwater contamination of the property; the results of these tests were provided to the Blev-inses in January 2012. Mr. Blevins said that in the spring of 2012, the two trees “started to leaf out and then they died.” After another field test in February 2012 also revealed saltwater contamination, a contractor removed about 30 more trees.
IfiOn October 18, 2012, the Blevinses filed suit against the Matthewses, their insurer, The Long Trusts and their insurer, and L.B. Walker Logging Company. The Long Trusts and their insurer settled with the Blevinses; the principal of the logging company answered that the company had dissolved years earlier.
On May 21, 2013, the Matthewses filed an exception of prescription, arguing that Mr. Blevins knew that there had been a saltwater spill on his property and that he suspected or should have suspected damage from the spill for more than a year prior to filing suit. The plaintiffs opposed that exception. The trial judge denied the exception on July 14, 2014, and this writ application followed.
•DISCUSSION
The applicants urge, and we agree, that the Blevinses knew or should have known that their property was damaged by the saltwater spill more than a year prior to filing suit.
La. C.C. art. 3492 provides that delictual actions are subject to a liberative prescriptive period of one year. When damage is caused to immovable property, the prescriptive period commences to run from the date the owner of the immovable acquired actual or constructive knowledge of the damage. La. C.C. art. 3493; Hogg v. Chevron USA, Inc., 2009-2632 (La.7/6/10), 45 So.3d 991; Anderson v. Bossier Parish Police Jury, 45,639 (La.App.2d Cir.12/15/10), 56 So.3d 275.
Constructive knowledge has been defined as whatever notice is enough to excite attention and put the injured party on guard or call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry might lead, [ 7and such information or knowledge as ought to reasonably put the injured party on inquiry is *506 sufficient to start the running of prescription. In assessing whether an injured party possessed constructive knowledge sufficient to commence the running of prescription, the court’s ultimate consideration is the reasonableness of the injured party’s action or inaction in light of the surrounding circumstances.
While prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong, and should not be used to force a person who believes he may have been damaged in some way to rush to file suit, a plaintiff is responsible to seek out those whom he believes may be responsible for a specific injury. In a case involving constructive knowledge, the time when prescription begins to run depends on the reasonableness of a plaintiffs action or inaction.
Anderson, supra (citations omitted). In other words, prescription begins to run upon “the acquisition of sufficient information which, if pursued, will lead to the true condition of things.” Marin v. Exxon Mobil Corp., 2009-2368 (La.10/19/10), 48 So.3d 234. The surrounding circumstances to be considered includes the plaintiffs education and intelligence, as well as the nature of the defendant’s conduct. Marin, supra.
The damage suffered must at least be actual and appreciable in quality; that is, determinable and not merely speculative. However, there is no requirement that the. extent of damages be certain or that they be fully incurred, before the plaintiff has a right of action. Therefore, in cases where a plaintiff has suffered some but not all of his damages, prescription runs from the date on which he first suffered actual and appreciable damage, even though he may thereafter come to a more precise knowledge of the damages he has already incurred or incur further damage. Harvey v. Dixie Graphics, Inc., 593 So.2d 351 (1992). Damage is considered to have been ¡^sustained, within the meaning of La. C.C. art. 3492, only when it has manifested itself with sufficient certainty to support accrual of a cause of action. Cole v. Celotex Corp., 620 So.2d 1154 (1993).
Ordinarily, the party pleading the exception of prescription bears the burden of proving the claim has prescribed; however, when the face of the petition reveals that the plaintiffs claim has prescribed, the burden shifts to the plaintiff to show why the claim has not prescribed. Anderson, supra.
When evidence is introduced at the hearing on the peremptory exception of prescription, the district court’s findings of fact are reviewed under the manifest error — clearly wrong standard of review. Carter v. Haygood, 2004-0646 (La.1/19/05), 892 So.2d 1261.
Here, Mr. Blevins admitted that:
• During the summer of 2011, he had seen trucks carrying dirt away from the Matthews property near his property line;
• In July 2011, a worker told him that “they had a salt water leak and that they had been cleaning it up”;
• The hole dug for remediation of the Matthews property was dug right on his property line, exposing several feet of the boundary marker;
• Trees had been removed from his property;
• He suspected that the saltwater spill had come over on his property;
• He told Dews that “water had seeped off of this property here which was not his and had seeped over on his”;
*507 • In September 2011, he contacted the Office of Conservation and reported that the saltwater spill had killed two of his trees;
[• He told Fomby on September 14, 2011, that, “I think there is some contamination got over there”;
• He did not believe that his trees were dying because of the drought; and
• He took soil samples of his property in early October 2011 and sent them off for analysis.
All of these facts occurred more than one year prior to the date the plaintiffs filed their lawsuit. The evidence shows that not only were the facts sufficient to excite the plaintiffs’ attention, Mr. Blevins actually believed no later than September 13, 2011, that he had damage from the saltwater spill because he reported that belief to Fomby. Although Mr. Blevins apparently did not have the results of the soil tests until November 2011, his actual knowledge of the saltwater contamination of the property was not necessary for the commencement of the prescriptive period. Likewise, the commencement of prescription was not delayed because the plaintiffs had limited knowledge of the extent of their damages; their cause of action arose when they suffered actual and appreciable damage, which was no later than September 13, 2011.
The plaintiffs argue that the saltwater contamination of their property constituted a continuing tort, thus making their action timely. When damaging conduct continues, prescription runs from the date of the last harmful act. Hogg, supra; South Central Bell Tel. Co. v. Texaco, Inc., 418 So.2d 531 (La.1982). However, a situation in which the tortious conduct complained of is ongoing must be distinguished from an act which causes continuing injury by permanently changing the physical | mcondition of the land. When a tortious act which permanently changes the physical condition of the land is concluded, no additional causes of action accrue merely because the damage continues to exist or even progressively worsens. Hogg, supra.
The damage to the plaintiffs’ property was sustained when saltwater leaked from the pipeline in June after Mr. Matthews hit the line with the dozer. The fact that the plaintiffs’ property continued to be contaminated with saltwater for a period of time thereafter does not make the spill into a continuing tort; the saltwater leakage was apparently stopped during the early remediation work in June or July 2011.
Finally, the plaintiffs argue that their lawsuit was timely by application of the doctrine of contra non valentem. In order to mitigate occasional harshness of the operation of the prescription statute, our courts have implemented this jurisprudential principle. The principle is based on the equitable notion that one is not required to exercise a right when it is impossible for him or her to do so. Harvey, supra. The doctrine of contra non valentem applies only in exceptional circumstances. The courts have recognized four situations in which the doctrine of contra non valentem applies. Marin, supra; Renfroe v. State ex rel. Dept. of Transp. & Dev., 2001-1646 (La.2/26/02), 809 So.2d 947.
The first three circumstances are clearly inapplicable in this matter. The fourth situation in which contra non valentem may apply is cases in which a plaintiff is not aware of the damage suffered, or is not aware that the damage suffered is the fault of the defendant. In those cases, contra non valentem operates to suspend the running of prescription until such time that In the plaintiff knew or reasonably should have known that his or her damages were the fault of the defendant’s negligent act. Harvey, supra. However, contra non valentem does not *508 apply if the plaintiffs ignorance is attributable to his own wilfulness or neglect. Renfroe, supra; Henderson v. Diamond Datsun, Inc., 413 So.2d 542 (La.App. 4 Cir.1982).
The record plainly shows that Mr. Blevins believed, by September 13, 2011, that saltwater from the Matthews property had migrated onto his property after the pipeline was damaged earlier in the summer. Although Mr. Blevins said that he had trouble getting information from the various defendants and the remediation contractors, that did not stop him from drawing the correct conclusion, more than a year before filing suit, that his property had been damaged by the spill. The trial court’s finding to the contrary was plainly wrong.
Accordingly, the trial court’s judgment is hereby reversed and judgment is entered in favor of defendants, Patrick and Annette Matthews and Louisiana Farm Bureau Casualty Insurance Company, dismissing the plaintiffs’ lawsuit against the defendants, at plaintiffs’ cost.
WRIT GRANTED, JUDGMENT REVERSED, ACTION DISMISSED.